ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 11 2010

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

TCB

| | |
|---|---|
| ———————————————— x | |
| CITY OF PONTIAC GENERAL EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | : Civil Action No. |
| | : |
| | : __CLASS ACTION__ |
| Plaintiff, | : COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| | : |
| vs. | : **1:10-CV-0711** |
| | : |
| SCHWEITZER-MAUDUIT INTERNATIONAL, INC., FREDERIC P. VILLOUTREIX and PETER J. THOMPSON, | : |
| | : |
| Defendants. | : |
| ———————————————— x | __DEMAND FOR JURY TRIAL__ |

## INTRODUCTION

1.     This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Schweitzer-Mauduit International, Inc. ("Schweitzer" or the "Company"), between August 5, 2009 and February 10, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").

2.     Schweitzer manufactures and sells paper and reconstituted tobacco products to the tobacco industry, as well as specialized paper products for use in other applications.  The Company primarily offers tobacco industry products, which include cigarette, plug wrap, and tipping papers used to wrap various parts of a cigarette, reconstituted tobacco leaf ("RTL") for use as filler in cigarettes and cigars, and reconstituted tobacco wrapper and binder for cigars.  Schweitzer is the supplier of the co-developed, on-line banded cigarette paper technology used to produce low ignition propensity ("LIP") cigarettes.  It sells these products directly to the major tobacco companies or their designated converters.  The Company's principal executive offices are located in Alpharetta, Georgia, with operations in the United States and around the globe.

## SUMMARY OF THE ACTION

3.      During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results. Specifically, defendants misrepresented the strength of Schweitzer's competitive position in the U.S. and its ability to withstand European competition.  Defendants also concealed threats to Schweitzer's relationship with the Company's most important customer, Phillip Morris USA, Inc. ("Phillip Morris").  As a result of defendants' false and misleading statements, Schweitzer's stock traded at artificially inflated prices during the Class Period, reaching a high of $82 per share on January 14, 2010.  As a result of this inflation, Schweitzer was able to consummate a secondary offering of 1.8 million shares of its stock at $60 per share in November 2009.

4.      On February 10, 2010, after the market closed, Schweitzer reported its fourth quarter and full year 2009 financial results, in a release which stated in part:

> Schweitzer-Mauduit International, Inc. today reported fourth quarter 2009 earnings results for the period ended December 31, 2009.
>
> **Fourth Quarter/Full Year 2009 Financial Highlights**:
>
> - Fourth quarter net income of $10.7 million; $35.6 million full year
>
> - Fourth quarter net sales of $188.5 million; $740.4 million full year

- Fourth quarter adjusted EBITDA of $33.6 million (excluding restructuring and impairment expenses); $142.1 million full year

- Diluted net income per share of $0.61, compared to a loss of $(0.44) per share in fourth quarter 2008

- Excluding per share restructuring and impairment expense of $0.35 and $0.58, respectively, adjusted net income per share of $0.96 compared to $0.14 per share in the fourth quarter of 2008; $4.25 full year

- Management is increasing guidance for 2010 diluted earnings per share excluding restructuring and impairment expense to at least $4.60, an 18% increase from the pro-forma dilution-adjusted 2009 earnings excluding restructuring and impairment expense of $3.91

**Fourth Quarter Operational Highlights**:

- Growth in high-value products, including full migration to Low Ignition Propensity (LIP) cigarette papers in the U.S. market

- Profitable performance from our China joint venture

- Initiation of LIP patent infringement litigation . . .

*    *    *

Schweitzer-Mauduit filed a patent infringement action on February 8, 2010, in the United States District Court for the District of South Carolina, Charleston Division. . . .

**Fourth Quarter 2009 Results**

Net sales were $188.5 million in the three month period ended December 31, 2009, a 7% increase versus the prior-year quarter. Net sales increased $11.6 million as a result of a $19.2 million improvement in the mix of products sold and higher selling prices, and $14.3 in favorable foreign currency exchange rate impacts. These increases were partially offset by $13.6 million from an 8% decrease in unit sales volumes and an $8.3 million sales decrease at our Malaucene facility which ceased operations during the fourth quarter.

Operating profit was $11.7 million in the three month period ended December 31, 2009 versus an operating loss of $2.5 million in the prior-year quarter. Excluding pre-tax restructuring and impairment expenses, operating profit was $21.4 million during the fourth quarter of 2009 compared with $11.3 million during the fourth quarter of 2008. The higher operating profit was primarily due to $14.0 million from an improved mix of products sold and higher selling prices and $5.4 million from cost reductions and lower manufacturing costs. These favorable impacts were partially offset by $6.7 million in higher non-manufacturing expenses, reflecting higher incentive compensation accruals due to improved results and a higher SWM share price.

5.      Most alarming, however, was news that was disclosed on the conference call following the release:

[VILLOUTREIX:] It is worth mentioning that Phillip USA has informed us of an intention to use LIP product printed by US converter on imported base paper as a commercial alternative for one of their low-cost brands. To date, we believe that the volume involved is very small. As previously communicated, we regularly retail competitive activity for the presence of other LIP products, and to determine if those products infringe on our granted patents.

*       *       *

[ANALYST:]   Just want to hit on one issue that may or may not be in stock, but your comment on Phillip Morris sourcing to third party for printing outside your license, can you give us a little more detail on why they're doing that? Is it their ability to take the same licenses and do it for all their business, and how much of a hit if at all is that to your profitability?

[VILLOUTREIX:]  Yes. Let me answer this. It's possible, through the supply agreement that we have in the USA, they have the able [sic] to source offline print banded products outside of the contract. So their online banded product, we have an exclusive arrangement with them where 1% of the online products is to be supplied from Spotswood New

Jersey. In the discussions we had with Phillip Morris USA last year, it appears to us that the intention to assess an alternative product is essentially driven by security of supply considerations.

6.    Defendants even suggested the Company might sue Phillip Morris, its most important customer.

7.    On February 10, 2010, Schweitzer also announced the filing of a patent infringement action alleging that the defendants in the action infringed on Schweitzer's U.S. patent based on the sale of cigarette papers in the U.S. that are designed for use in the manufacture of LIP cigarettes.  The suit, filed in South Carolina federal court, accused European competitors of infringing on Schweitzer's Patent No. 6,725,867.

8.    As a result of Schweitzer's news of Phillip Morris's decision to try competitive products and the announcement of its fourth quarter 2009 financial results and its patent lawsuit, Schweitzer's stock tumbled $23.58 per share to close at $46.65 per share on February 11, 2010, a one-day decline of nearly 34% on volume of nearly 14 million shares.

9.    The true facts, which were then known by or available to the defendants during the Class Period, were:

(a)    Schweitzer's competitive position was not adequately protected from foreign competition as to LIP paper, as such competitors were increasingly developing alternative methods to manufacture banded LIP paper;

(b)    The Company's most important customer, Phillip Morris, was not in agreement with Schweitzer as to a license agreement between the two companies; and

(c)    The Company's competitive position was much more precarious than represented by defendants and the efforts by other manufacturers to invade Schweitzer's territory were growing.

10.    As a result of defendants' false statements, Schweitzer's stock traded at inflated levels during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down 43% from their Class Period high.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.  Jurisdiction is conferred by §27 of the 1934 Act.

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

13.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because Schweitzer maintains its headquarters in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

14.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

15.    Schweitzer's principal executive offices are located at 100 North Point Center East, Suite 600, Alpharetta, Georgia.

**PARTIES**

16.    Plaintiff City of Pontiac General Employees' Retirement System purchased Schweitzer common stock as described in the attached certification and was damaged thereby.

17.    Defendant Schweitzer is a multinational diversified producer of specialty papers and a supplier of fine papers to the tobacco industry.  The Company manufactures and sells paper and reconstituted tobacco products to the tobacco industry, as well as specialized paper products for use in other applications. Schweitzer is headquartered in Alpharetta, Georgia, with  offices in Torrance, California, and a presence around the globe.

18.    Defendant Frederic P. Villoutreix ("Villoutreix") is, and at all relevant times was, Chairman of the Board and Chief Executive Officer ("CEO") of Schweitzer.

19.    Defendant Peter J. Thompson ("Thompson") is, and at all relevant times was, Treasurer, Chief Financial Officer ("CFO") and Strategic Planning Officer of Schweitzer.

20.    The defendants referenced above in ¶¶18-19 are referred to herein as the "Individual Defendants."

21.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Schweitzer's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive

representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

22.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Schweitzer. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Schweitzer common stock was a success, as it: (i) deceived the investing public regarding Schweitzer's prospects and business; (ii) artificially inflated the price of Schweitzer common stock; (iii) permitted the Company to complete an offering of 1.8 million shares of Schweitzer stock for proceeds of $108 million; and (iv) caused plaintiff and other members of the Class to purchase Schweitzer common stock at inflated prices.

23.    Defendants were also motivated by the compensation arrangements of Schweitzer. Defendants' compensation was in large part determined by the reported financial performance of the Company, including by hitting certain revenue, gross margin and earning before interest and taxation targets.

## CLASS ACTION ALLEGATIONS

24.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise

acquired the common stock of Schweitzer. Excluded from the Class are defendants and their family members, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

25.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Schweitzer has over 15 million shares of stock outstanding, owned by hundreds if not thousands of persons.

26.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the 1934 Act was violated by defendants;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Schweitzer; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

- 10 -

27.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

28.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

29.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

30.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## BACKGROUND

31.    Schweitzer manufactures and sells paper and reconstituted tobacco products to the tobacco industry, as well as specialized paper products for use in other applications. The Company primarily offers tobacco industry products, which include cigarette, plug wrap, and tipping papers used to wrap various parts of a cigarette, RTL for use as filler in cigarettes and cigars, and reconstituted tobacco wrapper and binder

for cigars. Schweitzer is the supplier of the co-developed, on-line banded cigarette paper technology used to produce LIP cigarettes. It sells these products directly to the major tobacco companies or their designated converters. The Company's non-tobacco industry products comprise a diverse mix of products, certain of which represent commodity paper grades produced to enhance machine operations. Schweitzer and its subsidiaries conduct business in approximately 90 countries with operations in the United States, France, Brazil, the Philippines, Indonesia, Canada, and a joint venture in China. The Company was founded in 1995 and is headquartered in Alpharetta, Georgia.

     32.    The Company's largest and most important customer is Phillip Morris. Schweitzer's business was highly dependent on protecting its competitive position to prevent foreign competitors from taking its business. The Company had represented in its 2008 Form 10-K that its position was strong with respect to its LIP product:

> To date, the cigarette papers for LIP cigarettes offered by Schweitzer-Mauduit's competitors, have not achieved broad commercial success.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

     33.    On August 5, 2009, Schweitzer announced its second quarter 2009 financial results, in a release which stated in part:

Schweitzer-Mauduit International, Inc. ("Schweitzer-Mauduit" or "the company") today reported second quarter 2009 earnings results for the period ended June 30, 2009.

Second Quarter/Year-To-Date Financial Highlights:

— Second quarter net income of $7.1 million; $20.4 million year-to-date

— Second quarter net sales of $183.3 million; $367.4 million year-to-date

— Second quarter adjusted EBITDA of $33.4 million (excluding restructuring and impairment expenses); $64.1 million year-to-date

— Free cash flow of $6.1 million and $11.9 million year-to-date

— Diluted net income per share of $0.45, compared to $0.13 per share in second quarter 2008; excluding per share restructuring and impairment expense of $0.57 and $0.15, respectively, adjusted net income per share of $1.02 compared to $0.28 per share in the second quarter of 2008

— Net debt decreased to $156.7 million from $167.9 at December 31, 2008

Second Quarter Operational Highlights:

— Continued strong growth in high-value products

— Expanding demand for Low Ignition Propensity (LIP) in North America and beyond

— Growing demand for Reconstituted Tobacco Leaf (RTL) products helped drive gains from this high-value product

— Improved operational performance, primarily from rebuilt paper machine in France

— Achieved additional savings from ongoing cost reduction initiatives

Frederic Villoutreix, Chairman of the Board and Chief Executive Officer, commented, "Our second quarter results further build on our

- 13 -

first quarter earnings improvement and are indicative of the successful implementation of our operating and financial strategy. We are benefiting from restructuring initiatives aimed at transforming our core manufacturing operations toward higher-value products. We drove strong results in the second quarter, exceeding our own expectations for operating profit margin gains and free cash flow."

Mr. Villoutreix continued, "Our year-to-date performance gives us confidence in both our plan and in our ability to execute that plan. Our near term strategy will continue to focus on our ongoing transformation that better positions us to effectively manage through these uncertain economic times. *We are focused on cost control, operational efficiency and the delivery of earnings growth from our high value LIP and reconstituted tobacco products. As a result of our record-level second quarter results, coupled with a less uncertain general economic outlook for the balance of the year, we now expect to achieve full-year earnings better than $3.50 per share, excluding restructuring and impairment expenses but including expected incremental operating losses ranging from $0.42 to $0.47 per share related to the closure of the Malaucene facility.*"

*    *    *

Restructuring and Impairment Expenses

During April 2009, the company announced plans to close its finished tipping paper production facility in Malaucene, France. Consultations with the Work's Council were concluded on July 22, 2009 and, as a result, management expects to reduce employment by approximately 210 people by the fourth quarter of 2009. These actions resulted in restructuring expense of $12.2 million during the second quarter of 2009 mostly related to employee severance accruals. We expect to record approximately $13 million of restructuring expenses during the remainder of 2009 related to this plan. The decision to close the Malaucene facility reflects that previous efforts to improve operating results for this location were not successful and highlights Schweitzer-Mauduit's strategy to rationalize its global manufacturing footprint and refocus resources to achieve leading positions in core product categories

that provide opportunity for competitive advantage. Following the divestiture of this finished tipping paper facility in France, all of Schweitzer-Mauduit's focus will be on product lines that represent core technologies and in which we hold a number one or two world-wide market position.

In the second quarter, the company also recorded $1.0 million of restructuring expense related to severance accruals in connection with general staff reductions in France. In the quarters ended June 30, 2009 and 2008, the company incurred $13.3 million and $3.7 million in expenses related to all restructuring actions.

34.    After releasing its second quarter 2009 financial results, on August 6, 2009, Schweitzer held a conference call for analysts, investors and media representatives during which defendant Villoutreix represented the following:

[ANALYST:]    Okay. And then, last, if I could just get an update really on your confidence in your LIP patents outside of the US at more of – as more countries look to require the use of LIP, I would think competitive pressures would intensify. And so what is your – your confidence level in patents on your process?

[VILLOUTREIX:]    *I would say our confidence level is good. We have some patents that were already granted in Europe. Some others are in the final stage of application and we have good reason to believe that we have a solid IP protection there.*

\*      \*      \*

[VILLOUTREIX:]    So let me answer that question. For Australia, BAT is a market leader in this country with the market coverage estimated at 60%. The other big player is Phillip Morris International and I'll say, Phillip Morris International at this stage has not officially announced their technology decision. We had some indication, but they will adopt the online technology which we – the same as Phillip Morris USA . . . .    And so we anticipate that we could fill part of their needs

- 15 -

knowing that there's a competitor in Spain that has also production capabilities. So this is just speculation at this stage. No decision has been made.

35.    Following these favorable announcements, Schweitzer's stock skyrocketed from $34.21 per share to $47.90 per share.

36.    On November 3, 2009, Schweitzer announced its third quarter 2009 financial results, in a release which stated in part:

> Schweitzer-Mauduit International, Inc. today reported third quarter 2009 earnings results for the period ended September 30, 2009 and announced plans to construct an Asian greenfield production site to produce reconstituted tobacco leaf (RTL).

Third Quarter/Year-To-Date Financial Highlights:

- Third quarter net income of $4.5 million; $24.9 million year-to-date

- Third quarter net sales of $184.5 million; $551.9 million year-to-date

- Third quarter adjusted EBITDA of $44.4 million (excluding restructuring and impairment expenses); $108.5 million year-to-date

- Free cash flow of $23.4 million and $35.3 million year-to-date

- Diluted net income per share of $0.27, compared to $0.43 per share in third quarter 2008; excluding per share restructuring and impairment expense of $1.12 and $0.11, respectively, adjusted net income per share of $1.39 compared to $0.54 per share in the third quarter of 2008

- Net debt decreased to $126.7 million from $167.9 million at December 31, 2008

\*    \*    \*

- 16 -

Frederic Villoutreix, Chairman of the Board and Chief Executive Officer, commented, "Our third quarter results continue to build on the broad-based improvement in our business achieved in the first half of 2009. Our excellent results for the quarter demonstrate the continuing success of our restructuring initiatives to transform our core manufacturing operations toward higher-value products. During the quarter, we progressed in closing our Malaucene, France production site and announced further restructuring activity in France and the U.S. resulting in additional restructuring and impairment expenses. These actions are anticipated to be the last of our downsizing steps for the foreseeable future and were due to continued declines in demand for our traditional tobacco-related papers in North America and western Europe. We are focused in the near term on successfully executing the remaining restructuring activities, continuing to grow our RTL and LIP business franchises and sustaining profitable operations at our Chinese paper joint venture, CTM. We are also excited to announce a major growth initiative: the planned approximate $117 million investment to establish a wholly owned greenfield RTL production facility in the Philippines."

Mr. Villoutreix continued, "By expanding RTL through a planned production facility in the Philippines, we expect to significantly strengthen our leadership position in this key product segment while expanding our presence in emerging markets with strong growth prospects. *Also, through our RTL and LIP technologies, we are poised to benefit from increased regulatory efforts to reduce undesirable aspects of cigarettes. The transformation of our RTL franchise into a truly global operation, ongoing efforts to expand our LIP franchise to Europe and beyond and the revitalization of our base paper business establishes a formidable foundation for future revenue and earnings growth.*"

"SWM is becoming a premier specialty company and living up to our vision of being the undisputed leader of engineered solutions to the tobacco industry. We now expect to achieve full-year 2009 earnings of at least $4.00 per share, excluding restructuring and impairment expenses but including expected operating losses of approximately $0.50 per share related to the closure of the Malaucene facility. For 2010, we estimate earnings per share of approximately $5.00, excluding restructuring and

- 17 -

impairment expenses, with growth attributable to expanding RTL and LIP sales, full year profitability at our China paper joint venture and sustained profitability in our base paper business despite expected pressures on current margins caused by lower demand, a likely difficult pricing environment for major customers' 2010 contract renewals and inflationary pressures."

*       *       *

RTL Production Expansion

In order to meet a growing demand for RTL and to diversify our existing production base in France to meet customer security of supply needs, we intend to expand our RTL production capacity into Asia through the construction of a wholly owned facility in the Philippines focused on RTL production. The stand-alone, single-machine facility, separate from our current paper mill, will be located near Manila and is expected to have approximately 30,000 metric tons of annual capacity which will increase our total world-wide RTL production capacity by approximately 38% when completed. We expect operations to commence in late 2011. We already have entered into a seven-year supply agreement with one of our current customers and are in advanced supply discussions with another multinational cigarette manufacturer that together would sellout approximately 50% of the new facility's capacity. We are exploring options to fund the expected approximate $117 million total investment of the new production facility, including using our existing credit agreement as well as potentially securing new debt or equity capital.

37.    After releasing its third quarter 2009 financial results, on November 4, 2009, Schweitzer held a conference call for analysts, investors and media representatives during which defendant Villoutreix represented the following:

[VILLOUTREIX:]  I would say, David, that there is a significant amount of competitive activity in the evaluation of products but as of

today none that have been validated by the multinationals. *My belief is it has a lot to do with the strength of our IP and patent portfolio*.

38.    By this time, Schweitzer's stock was trading as high as $62 per share.

39.    On November 9, 2009, Schweitzer announced its plan to offer 1.8 million shares of the Company's common stock in an underwritten public offering. Goldman, Sachs & Co. would be acting as book-running manager for the offering.

40.    On November 11, 2009, Schweitzer announced the pricing of its underwritten offering of 1.8 million shares of common stock, at an offering price of $60 per share, for gross proceeds of $108 million. In part, the Company stated:

> The company intends to use the net proceeds from the offering for general corporate purposes, including the company's planned funding of the construction and working capital needs of a new Reconstituted Tobacco Leaf (RTL) facility in the Philippines and a potential equity contribution for an RTL joint venture in China. Pending such use, the company intends to reduce outstanding balances under its current revolving credit facility with the net proceeds from the offering.

41.    In early January 2010, Schweitzer management met with analysts to update them on the Company's business. Following this meeting, Oppenheimer & Co., Inc. issued a report on January 6, 2010 entitled "Schweitzer-Maudit Int'l – Update from Management Meeting," which stated in part:

> We remain positive. *Shipments of LIP in the US may have reached ~100% penetration in 4Q09*. Europe remains on pace to issue a final LIP standard by year-end. Guidance for 2010 is likely to be revised when 4Q09 is reported. EPS in excess of $10 remains likely in 2012, as

we see it.  We maintain our Outperform rating and increase our price target to $85 from $75.

- Adoption of LIP in the EU remains on pace for mid-2011/early 2012.  The working group meets in April and could finalize the standard 6-9 months later.  The adoption ramp should be fairly rapid – faster than the US.

- Management estimates US/global LIP volumes could increase to ~14K MT/17.6K MT in 2010 from ~8K MT/9.4K MT in 2009, helped by full US adoption and the introduction of Australia and Finland.  Global volumes could increase to 50.3K MT by 2013 as the EU (29K MT) and S Africa/S Korea (4K MT combined) markets come online.

*    *    *

- SWM, which reports 4Q09 earnings on 2/10 AMC, is likely to update previous 2010 guidance of "around $5" prior to 12% dilution from the recent equity offering.  ***Because management is now comfortable with SWM's earnings growth ramp, it could give more accurate (and potentially upwardly revise) guidance.***

- Overall, we remain positive and believe EPS greater than $10 could be likely in 2012.  This could be driven by a full annual contribution from LIP in the US, LIP in Europe ($3+/share) and RTL in China ($1/share) and the Philippines ($2/share).  This excludes any potential for LIP in China later this decade.

42.  On February 10, 2010, Schweitzer's stock closed at $70.23 per share.

43.  Then, after the market closed on February 10, 2010, Schweitzer reported

its fourth quarter and full year 2009 financial results, in a release which stated in part:

Schweitzer-Mauduit International, Inc. today reported fourth quarter 2009 earnings results for the period ended December 31, 2009.

**Fourth Quarter/Full Year 2009 Financial Highlights**:

- Fourth quarter net income of $10.7 million; $35.6 million full year

- Fourth quarter net sales of $188.5 million; $740.4 million full year

- Fourth quarter adjusted EBITDA of $33.6 million (excluding restructuring and impairment expenses); $142.1 million full year

- Diluted net income per share of $0.61, compared to a loss of $(0.44) per share in fourth quarter 2008

- Excluding per share restructuring and impairment expense of $0.35 and $0.58, respectively, adjusted net income per share of $0.96 compared to $0.14 per share in the fourth quarter of 2008; $4.25 full year

- Management is increasing guidance for 2010 diluted earnings per share excluding restructuring and impairment expense to at least $4.60, an 18% increase from the pro-forma dilution-adjusted 2009 earnings excluding restructuring and impairment expense of $3.91

**Fourth Quarter Operational Highlights**:

- Growth in high-value products, including full migration to Low Ignition Propensity (LIP) cigarette papers in the U.S. market

- Profitable performance from our China joint venture

- Initiation of LIP patent infringement litigation . . .

*    *    *

**<u>Fourth Quarter 2009 Results</u>**

Net sales were $188.5 million in the three month period ended December 31, 2009, a 7% increase versus the prior-year quarter. Net sales increased $11.6 million as a result of a $19.2 million improvement in the mix of products sold and higher selling prices, and $14.3 in favorable foreign currency exchange rate impacts. These increases were partially offset by $13.6 million from an 8% decrease in unit sales volumes and an $8.3 million sales decrease at our Malaucene facility which ceased operations during the fourth quarter.

Operating profit was $11.7 million in the three month period ended December 31, 2009 versus an operating loss of $2.5 million in the prior-year quarter. Excluding pre-tax restructuring and impairment expenses, operating profit was $21.4 million during the fourth quarter of

- 21 -

2009 compared with $11.3 million during the fourth quarter of 2008. The higher operating profit was primarily due to $14.0 million from an improved mix of products sold and higher selling prices and $5.4 million from cost reductions and lower manufacturing costs. These favorable impacts were partially offset by $6.7 million in higher non-manufacturing expenses, reflecting higher incentive compensation accruals due to improved results and a higher SWM share price.

\*  \*  \*

**Restructuring and Impairment Expenses**

In the quarters ended December 31, 2009 and 2008, the company incurred $9.7 million and $13.8 million, respectively, in expenses related to restructuring actions and asset impairments. For the full year 2009 and 2008, the company incurred $50.2 million and $22.1 million, respectively.

Cash severance expenses associated with our previously announced overhead restructuring plan in France are now expected to total approximately $18 million through the planned completion of the actions in the third quarter of 2010 and result in annual pre-tax savings of approximately $8 million, or approximately $0.32 per share, with roughly half of these savings expected to be realized during 2010.

44. Most alarming, however, was news that was disclosed on the conference call following the release:

> [VILLOUTREIX:] *It is worth mentioning that Phillip USA has informed us of an intention to use LIP product printed by US converter on imported base paper as a commercial alternative for one of their low-cost brands*. To date, we believe that the volume involved is very small. As previously communicated, we regularly retail competitive activity for the presence of other LIP products, and to determine if those products infringe on our granted patents.

\*  \*  \*

- 22 -

[ANALYST:]   Just want to hit on one issue that may or may not be in stock, but your comment on Phillip Morris sourcing to third party for printing outside your license, can you give us a little more detail on why they're doing that? Is it their ability to take the same licenses and do it for all their business, and how much of a hit if at all is that to your profitability?

[VILLOUTREIX:]   Yes. Let me answer this. It's possible, through the supply agreement that we have in the USA, they have the able to source offline print banded products outside of the contract. So their online banded product, we have an exclusive arrangement with them where 1% of the online products is to be supplied from Spotswood New Jersey. In the discussions we had with Phillip Morris USA last year, it appears to us that the intention to assess an alternative product is essentially driven by security of supply considerations.

*       *       *

[ANALYST:]   And then just one last question. In your risk section, you have the $9 million of disputed revenue from Phillip Morris USA. Can you talk a little bit about that and how you see that evolving?

[THOMPSON:]   Sure. Phillip Morris has disputed the calculation under our cost plus agreement for the pricing of the banded product, LIP product, and that dispute has been in place through since about the middle of 2009. It updated – the amount updated here based on the fourth quarter release based on purely the additional invoicing that we had. We don't know the way that Phillip Morris is determining that disputed amount. They're just saying, "This is the disputed amount," which reserves their rights to seek relief against that amount. Yet at the same time they're paying their bills, and we're collecting that cash. We believe that we've calculated the pricing correctly under the formula. It's the same formula that that's been in place for many, many years, so we don't believe the dispute has any merit. The fundamental issue is with that the volume declines in the Spotswood facility, the cost-plus for that arrangement is going up, and as Frederic alluded to, when we get to the point where Phillip Morris is the only product being made at that facility, 100% of the cost is essentially going into that product. So I think it's

- 23 -

more of a reaction to the situation that we face than any mechanical issues two the calculation of the price.

45.    Defendants even suggested the Company might sue Phillip Morris, its most important customer.

46.    Also on February 10, 2010, after the market closed, Schweitzer issued a press release entitled "Schweitzer-Mauduit Announces Patent Infringement Action," which stated in part:

> Schweitzer-Mauduit International, Inc. today announced its filing of a patent infringement action on February 8, 2010, in the United States District Court for the District of South Carolina, Charleston Division. The suit was filed against the following parties as defendants:
>
> > Delfort Group, an Austrian corporation
> >
> > Astra Tobacco Corporation, a North Carolina corporation
> >
> > Julius Glatz, GmbH, a German corporation
> >
> > LIPtec, GmbH, a German corporation
>
> The suit alleges that the defendants infringe United States Patent Number 6,725,867 based on the sale of cigarette papers in the U.S. that are designed for use in the manufacture of lower ignition propensity cigarettes. Schweitzer-Mauduit is represented by the firms of Jones Day and Buist, Moore Smythe & McGee P.A.
>
> The company considers litigation to be a serious matter and does not undertake it lightly or in haste. However, we felt that it was appropriate to take this action now in light of our assessment of activities in the market. Schweitzer-Mauduit has been engaged in the study of the mechanisms at work and the means for designing cigarette papers that aid in controlling the ignition of a cigarette for over 20 years. To our

knowledge, this substantially predates work by any of our competitors in this area and is the foundation on which Schweitzer-Mauduit has built a portfolio of patents around the world that covers a range of products and processes, in particular banding approaches, relating to this technology. In our view, our early work has allowed us to establish a strong intellectual property position on many of the fundamental techniques currently employed commercially to produce lower ignition propensity papers and our work continues to further develop this technology.

47.    As a result of Schweitzer's news of its patent lawsuit and fourth quarter 2009 financial results and Phillip Morris's decision to try competitive products, Schweitzer's stock tumbled $23.58 per share to close at $46.65 per share on February 11, 2009, a one-day decline of 34% on volume of nearly 14 million shares.

48.    The true facts, which were then known by or available to the defendants during the Class Period, were:

(a)    Schweitzer's competitive position was not adequately protected from foreign competition as to LIP paper, as such competitors were increasingly developing alternative methods to manufacture banded LIP paper;

(b)    The Company's most important customer, Phillip Morris, was not in agreement with Schweitzer as to a license agreement between the two companies; and

(c)    The Company's competitive position was much more precarious than represented by defendants and the efforts by other manufacturers to invade Schweitzer's territory were growing.

- 25 -

49.    As a result of defendants' false statements, Schweitzer's stock traded at inflated levels during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than 43% from their Class Period high.

## ADDITIONAL SCIENTER ALLEGATIONS

50.    During the Class Period, the Individual Defendants had both the motive and opportunity to conduct fraud. They also had actual knowledge of the falsity of the statements they made or acted in reckless disregard of the truth or falsity of those statements. In so doing, the Individual Defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Schweitzer stock during the Class Period.

## LOSS CAUSATION/ECONOMIC LOSS

51.    During the Class Period, as detailed herein, the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Schweitzer common stock and operated as a fraud or deceit on Class Period purchasers of Schweitzer stock by misrepresenting the Company's business and prospects. Later, when the Individual Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Schweitzer common stock fell precipitously, as the prior artificial

inflation came out of the price over time. As a result of their purchases of Schweitzer common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

52.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    The Individual Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's common stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiff and other members of the Class purchased Schweitzer common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

53.    At all relevant times, the market for Schweitzer common stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, Schweitzer filed periodic public reports with the SEC; and

(b)     Schweitzer regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

54.     Plaintiff incorporates all allegations in ¶¶1-53 above by reference.

55.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

56.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

- 28 -

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Schweitzer common stock during the Class Period.

57.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Schweitzer common stock. Plaintiff and the Class would not have purchased Schweitzer common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Individual Defendants' misleading statements.

58.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Schweitzer common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

59.    Plaintiff incorporates all allegations in ¶¶1-58 above by reference.

60.    The Individual Defendants acted as controlling persons of Schweitzer within the meaning of §20(a) of the 1934 Act. By virtue of their positions and their

power to control public statements about Schweitzer, the Individual Defendants had the power and ability to control the actions of Schweitzer and its employees. Schweitzer controlled the Individual Defendants and their other officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding damages and interest;

C.    Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED: March 11, 2010                COUGHLIN STOIA GELLER
                                      RUDMAN & ROBBINS LLP
                                     JOHN C. HERMAN
                                     Georgia Bar No. 348370


                                     _____
                                         JOHN C. HERMAN

3424 Peachtree Road, N.E., Suite 1650
Atlanta, GA  30326
Telephone:  404/504-6500
404/504-6501 (fax)

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

SULLIVAN, WARD, ASHER &
   PATTON, P.C.
CYNTHIA J. BILLINGS
25800 Northwestern Highway
1000 Maccabees Center
Southfield, MI  48075-1000
Telephone:  248/746-0700
248/746-2760 (fax)

Attorneys for Plaintiff

C:\Documents and Settings\garmstrong\Local Settings\Temporary Internet Files\OLK1\Cpt Schweitzer-Mauduit International (2).doc

- 31 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF PONTIAC GENERAL EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    (a)    Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Patel v. Parnes*, No. 2:07-cv-05364-MMM(SHx) (C.D. Cal.)
*Waterford Township Gen. Employees Ret. System v. CompuCredit Corp., et al.*, No. 1:08-cv-2270-TWT (N.D. Ga.)

        (b)    Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*City of Pontiac General Employees' Retirement System v. Stryker, Inc., et al.*, No. 10-cv-00376-RWS (S.D.N.Y.)

        (c)    Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*In re Schering-Plough Corporation/Enhance Sec. Litig.*, No. 2:08-cv-00397-DMC-MF (D.N.J.)
*In re TETRA Technologies, Inc. Sec. Litig.*, No. 4:08-cv-00965 (S.D. Tex.)
*In re NVIDIA Corporation Sec. Litig.*, No. 5:08-cv-04260-JW (N.D. Cal.)
*City of Pontiac General Employees' Retirement System v. CBS Corporation et al.*, No. 08-cv-10816 (S.D.N.Y.)
*City of Pontiac General Employees' Retirement System v. Immucor, Inc., et al.*, No. 1:09-cv-02351-TWT (N.D. Ga.)

SCHWEITZER-MAUDUIT

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of February , 2010.

CITY OF PONTIAC GENERAL
EMPLOYEES' RETIREMENT SYSTEM

By: _____

Its: _Chairman_____

- 2 -

SCHEDULE A

SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 12/09/2009 | 400 | $65.07 |
| 12/09/2009 | 400 | $65.06 |
| 12/11/2009 | 400 | $66.02 |
| 12/11/2009 | 1,300 | $66.44 |
| 12/16/2009 | 675 | $68.75 |
| 12/16/2009 | 900 | $68.73 |
| 01/15/2010 | 1,250 | $79.67 |
| 01/21/2010 | 675 | $78.20 |
| 01/21/2010 | 800 | $78.10 |
| 01/22/2010 | 75 | $75.70 |
| 01/22/2010 | 100 | $75.06 |
| 01/26/2010 | 200 | $76.71 |
| 01/26/2010 | 225 | $76.84 |
| 01/27/2010 | 175 | $76.64 |
| 01/27/2010 | 275 | $76.59 |
| 02/03/2010 | 825 | $72.42 |

Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 02/10/2010 | 400 | $68.62 |