UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

—————————————————— x

CITY OF PONTIAC GENERAL
EMPLOYEES' RETIREMENT
SYSTEM, Individually and on Behalf of
All Others Similarly Situated,

                 Plaintiff,

    vs.

SCHWEITZER-MAUDUIT
INTERNATIONAL, INC., FREDERIC
P. VILLOUTREIX and PETER J.
THOMPSON,

              Defendants.

—————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:10-cv-00711-TCB

CLASS ACTION

AMENDED COMPLAINT FOR
VIOLATIONS OF THE SECURITIES
LAWS


DEMAND FOR JURY TRIAL

By and through their undersigned counsel, Lead Plaintiffs City of Pontiac General Employees' Retirement System ("City of Pontiac") and the Western Washington Laborers-Employers Pension Trust ("Western Washington Laborers") (collectively, "Plaintiffs") allege the following against Schweitzer-Mauduit International, Inc. ("Schweitzer" or the "Company"), Frederic P. Villoutreix ("Villoutreix"), and Peter J. Thompson ("Thompson") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Schweitzer and other related parties and non-parties with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles and shareholder communications; (d) review of other publicly available information concerning Schweitzer, the other Defendants and related non-parties; and (e) interviews with factual sources, including individuals formerly employed by Schweitzer, and other industry participants.

## I.      SUMMARY OF THE ACTION

1.      This is a federal securities class action against Schweitzer and certain of its officers and/or directors for violations of the federal securities laws.  Plaintiffs

bring this action on behalf of themselves and the Class under the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiffs allege that between August 5, 2009 and February 10, 2010, inclusive (the "Class Period"), Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price by concealing from the market that it was facing competitive pressures from European competitors and threats to its relationship with its largest customer – Philip Morris USA ("PMUSA" or "Philip Morris").  As a result of the fraud described below, shareholders suffered millions of dollars in losses.

2.     Schweitzer was founded in 1995 and is headquartered in Alpharetta, Georgia.  The Company is a multinational diversified producer of specialty papers and a supplier of fine papers to the tobacco industry.  As further detailed below, the Company manufactures and sells paper and reconstituted tobacco products to the tobacco industry, as well as specialized paper products for use in other applications.

3.     Among these products, Schweitzer has developed and patented banded papers for the production of lower ignition propensity ("LIP") cigarettes.  LIP cigarettes are considered "fire-safe" cigarettes because of their reduced propensity to burn when left unattended.  Due to their enhanced safety, LIP paper is now required for cigarettes sold in virtually every state nationwide, and as of next year, European Union regulations will require cigarettes to be LIP compliant.  As a result, LIP

regulations have increased the demand for Schweitzer's products and spurred its growth over the past decade.  Indeed, the Company holds itself out as being the "world's leading producer of commercially proven cigarette paper for LIP cigarettes."[1]

4.     As a result, the Company's maintenance of its intellectual property protections and its market share are paramount to its business.  Likewise, the market viewed these considerations as an important metric of the Company's success. Accordingly, throughout the Class Period, Defendants repeatedly touted the strength of the Company's competitive position and the strength of its LIP patents.  In such a way, Defendants concealed the truth regarding competitive pressures the Company was facing and threats to its relationship with Philip Morris – its largest customer.  In particular, Defendants knew but failed to disclose that Philip Morris had informed Schweitzer of its intention to use LIP paper printed by a third-party and that the Company's dispute with Philip Morris over their cost-plus agreement was significant and could have a material adverse effect on the Company's results of operations. Moreover, Defendants knew but failed to disclose that they were facing significant

---

[1]     SWM, LIP Paper, http://www.swmintl.com/ (last visited Oct. 11, 2010).

- 3 -

and serious competition from European competitors, which would result in patent infringement litigation.

5.      Defendants' misrepresentations and omissions had the intended effect of inflating the Company's stock price throughout the Class Period.   Indeed, Schweitzer's stock reached an artificially high price of $83.63 per share on January 14, 2010.   Moreover, Defendants' wrongful acts, misleading statements, and omissions enabled the Company to complete a stock offering in November 2009 of 1.8 million shares of common stock at an inflated price of $60 per share for gross proceeds of $108 million.

6.      Eventually, Schweitzer could no longer conceal the competitive pressures it was facing and was forced to take action in order to protect its intellectual property. On February 10, 2010, after the market closed, Schweitzer announced that in light of its assessment of activities in the market, it had filed a patent infringement action against four competitors.   Moreover, the next day, on a call with analysts, Defendants revealed that Schweitzer was facing threats to its relationship with Philip Morris, its key customer.   Indeed, Defendants revealed that Philip Morris had informed Schweitzer of its intention to use LIP paper printed by a third-party and that the Company's dispute with Philip Morris over its cost-plus agreement was more significant than originally disclosed – approximately $9 million – which, if resolved

unfavorably, would have a material adverse effect on the Company's results of operations.

7.     These announcements, which stood in stark contrast to Defendants' previous disclosures, stunned the market, causing the price of Schweitzer stock to plummet by approximately 34% on unusually high trading volume, to close at $46.65 on February 11, 2010, resulting in millions of dollars of investor losses.  At the same time that Defendants misled shareholders, Defendant Thompson lined his pockets through insider sales of Company stock while in possession of material non-public information for proceeds totaling more than $1.4 million.

## II.     JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa), and 28 U.S.C. §1391(b).  Schweitzer maintains its headquarters in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

10.    In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.        Plaintiffs

11.    Lead Plaintiff City of Pontiac, as set forth in its certification already filed with the Court and incorporated by reference herein, purchased the common stock of Schweitzer at artificially inflated prices during the Class Period and has been damaged thereby.  On August 26, 2010, the Court appointed City of Pontiac to serve as Co-Lead Plaintiff in this action.

12.    Lead Plaintiff Western Washington Laborers, as set forth in its certification already filed with the Court and incorporated by reference herein, purchased the common stock of Schweitzer at artificially inflated prices during the Class Period and has been damaged thereby.  On August 26, 2010, the Court appointed Western Washington Laborers to serve as Co-Lead Plaintiff in this action.

### B.    Defendants

13.    Defendant Schweitzer was founded in 1995 and is headquartered in Alpharetta, Georgia, with offices in Torrance, California, and a presence around the

globe.  The Company is a multinational diversified producer of specialty papers and a supplier of fine papers to the tobacco industry.  As further detailed below, the Company manufactures and sells paper and reconstituted tobacco products to the tobacco industry, as well as specialized paper products for use in other applications.

14.    Defendant Villoutreix became Chairman of the Board and Chief Executive Officer ("CEO") of Schweitzer on January 1, 2009, and served in this capacity throughout the Class Period.  Prior to this, Defendant Villoutreix was the Chief Operating Officer of Schweitzer from February 2006 through December 2008.

15.    Defendant Thompson became Treasurer, Chief Financial Officer ("CFO") and Strategic Planning Officer of Schweitzer on January 22, 2009, and served in this capacity throughout the Class Period.  Prior to this, Defendant Thompson served as CFO and Treasurer from August 1, 2006 through August 10, 2008, and as Vice President of Strategic Planning and Implementation from August 11, 2008 until January 21, 2009.

16.    Defendants Villoutreix and Thompson are collectively referred to herein as the "Individual Defendants."

17.    During the Class Period, the Individual Defendants, as senior executive officers of Schweitzer, were privy to confidential and proprietary information concerning Schweitzer, its operations, finances, financial condition, and present and

future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning Schweitzer, as discussed in detail below. Because of their positions with Schweitzer, the Individual Defendants had access to non-public information about Schweitzer's business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

18.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Schweitzer's business.

19.   The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their executive and managerial positions with Schweitzer, each of the Individual Defendants had access to the adverse undisclosed information about Schweitzer's business prospects, financial condition, and performance as particularized herein, and knew or recklessly disregarded that these adverse facts rendered the positive representations made by or about Schweitzer and its business issued or adopted by the Company materially false and misleading.

20.   The Individual Defendants, because of their positions of control and authority as officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

21.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of Schweitzer, by virtue of his high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

22.     As senior executive officers and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to

Schweitzer's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of Schweitzer's securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

23.   The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Schweitzer's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Schweitzer's business, operations, management and the intrinsic value of Schweitzer common stock and caused Plaintiffs and other members of the Class to purchase Schweitzer common stock at artificially inflated prices.

24.   Defendants are liable for: (i) making false statements; and/or (ii) failing to disclose adverse facts known to them about Schweitzer. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Schweitzer common stock was a success, as it: (i) deceived the investing public regarding Schweitzer's prospects and business; (ii) artificially inflated the price of

Schweitzer common stock; (iii) permitted the Company to complete an offering of 1.8 million shares of Schweitzer stock for proceeds of $108 million; and (iv) caused Plaintiffs and other members of the Class to purchase Schweitzer common stock at inflated prices.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Background of the Company[2]

25.   Schweitzer was founded in 1995 and is headquartered in Alpharetta, Georgia.  Schweitzer was previously a division of papermaker Kimberly-Clark but became a stand-alone company at this time.  The Company holds itself out as "a multinational diversified producer of premium specialty papers headquartered in the United States of America and is the world's largest supplier of fine papers to the tobacco industry."  *See* Schweitzer's Form 10-Q for the period ending June 30, 2009, filed on August 5, 2009.  Indeed, the Company conducts business in over 90 countries and currently operates 11 production locations worldwide, with mills in the United States, France, the Philippines, Indonesia and Brazil, as well as a 50 percent equity interest in a mill in China.  *Id.*  The Company manufactures and sells paper and

---

[2]   All confidential witnesses will be referred to in the masculine to protect their identities.

reconstituted tobacco products to the tobacco industry as well as specialized paper products for use in other applications, including cigarette, plug wrap and tipping papers, or Cigarette Papers, used to wrap various parts of a cigarette, and reconstituted tobacco leaf ("RTL"), which is used as a blend with virgin tobacco in cigarettes and reconstituted tobacco wrappers and binders for machine-made cigars. *Id.* Schweitzer sells these products directly to the major tobacco companies or their designated converters in the Americas, Europe, Asia and elsewhere. *Id.*

26.    In particular, Schweitzer is a manufacturer of high porosity papers, which are used in manufacturing ventilated cigarettes, and banded papers for the production of lower ignition propensity ("LIP") cigarettes. *Id.* Schweitzer is the supplier of the co-developed, on-line banded cigarette paper technology used to produce LIP cigarettes. *Id.* It sells these products directly to the major tobacco companies or their designated converters. *Id.* Schweitzer also sells specialized paper products for use in other applications. *Id.*

## B.    The Demand for LIP Technology

27.    A LIP cigarette is one that has demonstrated a reduced ignition propensity in certain laboratory tests.  Accordingly, LIP cigarettes are often called "fire-safe" cigarettes because of their reduced propensity to burn when left

unattended.[3] The most common fire-safe technology used by cigarette manufacturers is to wrap cigarettes with two or three thin "bands" of less-porous paper that act as "speed bumps" to slow down a burning cigarette. *Id.* If a fire-safe cigarette is left unattended, the burning tobacco will reach one of these speed bumps and self-extinguish. *Id.* Fire-safe cigarettes meet an established cigarette fire safety performance standard, based on ASTM E2187, which requires that no more than 25 percent of 40 cigarettes tested burn their full length when placed on 10 layers of standard filter paper. *Id.*

28.     Due to the enhanced safety of LIP cigarettes, LIP legislation has spread since its initiation in 2003. Indeed, 50 states have passed fire-safe cigarettes legislation. Currently, LIP cigarette paper is required for cigarettes sold in 49 states. As of 2011, European Union regulations will require cigarettes to be LIP compliant. Thus, fire-safe cigarette legislation has increased demand for banded cigarette products both domestically and internationally.

---

[3]     *See* What is a fire-safe cigarette?, Coalition for Fire-Safe Cigarettes, http://firesafecigarettes.org/itemDetail.asp?categoryID=48&itemID=1190&URL=About%20fire-safe%20cigarettes/What%20is%20a%20fire-safe%20cigarette? (last visited Oct. 5, 2010).

### C.   Schweitzer's LIP Technology Was Key to Its Growth

29.     Schweitzer was one of the pre-eminent developers of LIP technology. According to the former Senior Corporate Vice President of Global LIP,[4] by 1995, Schweitzer had already begun developing its LIP technology, which began to be commercialized in the 2003 to 2004 timeframe, when state governments began requiring cigarettes be made with self-extinguishing paper, or LIP paper. Indeed, the Company has spent more than 20 years developing banded papers for LIP cigarettes.[5] According to Alex Boone, the sales director of cigarette fine papers for Schweitzer, "[w]e have numerous patents in the area of banded paper used in LIP cigarette designs. We have developed different cigarette paper base sheets and coating applications for the band and have a wide selection of products in use by our cigarette customers in their LIP cigarette designs." *Id.*

---

[4]     The former Senior Corporate Vice President of Global LIP was employed at Schweitzer as a full-time employee and/or consultant from Jan. 15, 2009 to Aug. 15, 2009. In this capacity, he reported to COO Otto Herbst. In March 2009, he became a consultant to Schweitzer and continued to work in the same capacity, but was employed as a contractor until his departure from the Company on August 15, 2009.

[5]     *See* Brinson, Brandy, "From the Sea," Tobacco Reporter Magazine, May 2008, available at http://www.tobaccoreporter.com/home.php?id=119&cid =4&article_id= 10869 (last visited Oct. 5, 2010).

30.     As the former Senior Corporate Vice President of Global LIP explained, Schweitzer's LIP technology is equally as important as the Company's "trade secrets," or the process in which the LIP technology is used to make banded LIP cigarette paper.  Schweitzer employs a significant amount of "artisan knowledge" in terms of how it goes about coating cigarette paper, how it pulls the paper through the paper-making machines, and the speed at which the paper is coated and dried.  All of the elements in the paper-making process are considered trade secrets and are as important as the amount and type of raw materials used to make the banded LIP paper, the space between the bands, and the burn rate.

31.     For example, in 2008, Schweitzer launched its Alginex water-based technology for banded cigarette papers.  The technology uses an all-natural alginate solution derived from seaweed, which is a common thickening ingredient in the food industry.  *See supra* n.5.  The former Senior Corporate Vice President of Global LIP explained that the Alginex solution is used to coat cigarette paper to retard air flow.  According to the Company, use of this coating eliminates the potential negative taste characteristics associated with solvent coatings and gives customers more options for LIP banded cigarette designs.  *See supra* n.5.

32.     Schweitzer's LIP intellectual property and technology has significantly impacted its growth as a Company.  Indeed, according to the former Senior Corporate

Vice President of Global LIP, prior to the growth in the LIP business, Schweitzer's gross margin was 16 percent. However, as LIP use increased in the United States, the Company's gross margin increased to 30 percent.

33.     Moreover, as the former Senior Corporate Vice President of Global LIP explained, the U.S. market only accounts for 7 percent of the global cigarette market. Thus, Europe and Asia represent significant growth opportunities for Schweitzer. Indeed, the former Senior Corporate Vice President of Global LIP noted that Eastern Europe accounts for 11 percent of the global cigarette market and Western Europe accounts for 15 percent. Thus, as LIP standards are put into place in Europe and Asia, this former employee explained that the Company's LIP business will continue to drive growth at Schweitzer. This was confirmed by Defendant Thompson, who touted how spreading LIP regulation would impact Schweitzer's business: "The big deal comes as time goes by, and LIP regulation moves around the world . . . If we're successful at continuing to have a leadership position in this product, it will be an opportunity to grow the company." [6]

_____

[6]     *See* Reeves, Amy, "Schweitzer-Mauduit International Alpharetta, Georgia Maker of  Tobacco Shifts to Growing Markets in Asia," Investors Business Daily, A05, September 15, 2009.

34.     Schweitzer's unique LIP technology put it in the driver's seat of a growing industry.   As the Company has stated, "[w]e are currently the leading producer of commercially proven cigarette paper for LIP cigarettes and continue to actively develop the technologies for such products."  *See* Schweitzer's Form 10-K for the period ending December 31, 2009, filed on March 8, 2010.  Indeed, Schweitzer is the sole domestic producer of cigarette papers in North America, and has stated that it believes that it has the majority supply position, estimated at 70 to 75% of the North American cigarette paper market.  *See* Schweitzer's Form 10-K for the period ending December 31, 2009, filed on March 8, 2010.  Moreover, Schweitzer's technology has poised it for continued growth abroad.

35.     Thus, Schweitzer's protection of its LIP intellectual property is key to its continued growth and success.  The Company has repeatedly acknowledged this:

- As of December 31, 2009, we owned 150 patents and had pending 80 patent applications covering a variety of Cigarette Papers, RTL and cigar wrapper and binder products and processes in the United States, western Europe and several other countries.  We believe that such patents, together with our papermaking expertise and technical sales support, have been instrumental in establishing us as the leading worldwide supplier of Cigarette Papers, RTL and reconstituted wrapper and binder made by the papermaking process. ***Patents have played a central role in establishing us as the world's leading independent producer of papers used for LIP cigarettes.***  *See* Schweitzer's Form 10-K for the period ending December 31, 2009, filed on March 8, 2010.

- 18 -

- As of December 31, 2008, we owned 137 patents and had pending 65 patent applications covering a variety of Cigarette Papers, RTL and cigar wrapper and binder products and processes in the United States, western Europe and several other countries. We believe that such patents, together with our papermaking expertise and technical sales support, have been instrumental in establishing us as the leading worldwide supplier of Cigarette Papers, RTL and reconstituted wrapper and binder made by the papermaking process. ***Patents have played a central role in establishing us as the world's leading independent producer of papers used for LIP cigarettes.*** *See* Schweitzer's Form 10-K for the period ending December 31, 2008, filed on March 6, 2009.

- As of December 31, 2007, we owned 132 patents and had pending 66 patent applications covering a variety of Cigarette Papers, RTL and cigar wrapper and binder products and processes in the United States, western Europe and several other countries. We believe that such patents, together with our papermaking expertise and technical sales support, have been instrumental in establishing us as the leading worldwide supplier of Cigarette Papers, RTL and reconstituted wrapper and binder made by the papermaking process. ***Patents have played a central role in establishing us as the world's leading independent producer of papers used for LIP cigarettes.*** *See* Schweitzer's Form 10-K for the period ending December 31, 2007, filed on March 7, 2008.

36.     Moreover, the Company has repeatedly represented that its position was strong with respect to its LIP product:

- To date, the cigarette papers for LIP cigarettes offered by Schweitzer-Mauduit's competitors, have not achieved broad commercial success. *See* Schweitzer's Form 10-K for the period ending December 31, 2008, filed on March 6, 2009.

- To date, the cigarette papers for LIP cigarettes offered by Schweitzer-Mauduit's competitors, have not achieved broad

commercial success. *See* Schweitzer's Form 10-K for the period ending December 31, 2007, filed on March 7, 2008.

37.     Accordingly, Schweitzer's growth is heavily dependent on its ability to maintain its competitive position and market share both domestically and internationally.  Domestically, the Company's continued relationship with Philip Morris for its LIP needs is paramount to its gross margins and ability to achieve its financial goals.  Moreover, as demand for cigarettes continues to grow in Europe and Asia, Schweitzer's business is highly dependent on protecting its competitive position abroad to prevent foreign competitors from taking its business.

38.     As Schweitzer's ability to maintain its competitive position and market share was critical to its financial success, the market also viewed it as an important metric of the Company's well being.  For example, analysts stated:

- "Any loss of market share to its competitors could reduce customer intimacy levels and hurt overall operating results." *See* Oppenheimer & Co, Inc. analyst report dated August 6, 2009.

- "The Company derives 60% of sales from its five largest customers, with the largest, Philip Morris, comprising 30% of revenue alone.  The loss of any of these customers could have a material impact on operations."  *See* SunTrust Robinson Humphrey analyst report dated February 11, 2010.

39.     Thus, Schweitzer was heavily motivated to protect its intellectual property and portray its competitive position and market share as strong.

### D.   Schweitzer's LIP Papers

40.     As the former Lab Tester[7] explained, there are various grades of banded LIP paper.  Indeed, the number of bands on the paper, the space between the bands and the thickness of the paper itself can vary from customer to customer and could depend on customer demand.

41.     Schweitzer produces two types of banded LIP paper.  "Online" banded paper was used by Philip Morris and the bands were printed on the paper at the Company's Spotswood, New Jersey plant as the paper was produced.  According to the former Senior Corporate Vice President of Global LIP, the online-banded LIP paper is made with a technology co-developed by Schweitzer and Philip Morris known as "MOD technology."

42.     The MOD technology employs a solvent to coat the cigarette paper during the paper-making process.  According to the former Lab Tester, PMUSA and Schweitzer collectively developed a "MOD adaptor" that fit on the five papermaking

---

[7]     The former Lab Tester was employed with Schweitzer for approximately 10 years until March 2010.  This former employee's job responsibilities included quality assurance testing of the various grades of paper produced at the Spotswood Mill's five paper-making machines, including the banded LIP paper.  The former Lab Tester examined finished paper products to ensure that they met Company and customer specifications.  He tested samples of various grades of paper and compared the results against the specification for that particular paper grade.

machines at the Spotswood Mill.  The adaptor enabled the machines to print the bands on the LIP paper as it was manufactured at the mill.  Philip Morris was the only cigarette maker with rights to use the MOD adaptor.

43.     The former Lab Tester believed the development of the MOD adaptor cost "millions" and the adaptor design was paid for by Philip Morris.  Philip Morris is the only customer whose LIP paper is printed with bands at Schweitzer's Spotswood Mill, using an MOD technology the two companies jointly developed.  The former Senior Account Manager[8] explained that while other customers could use the MOD technology, they would have to pay royalties to Philip Morris and Schweitzer so they typically did not.

44.     Schweitzer also manufactured "offline" banded paper, which it sold to other cigarette manufacturers.  While Schweitzer produced this paper on-site, it was sent to an outside company that printed or applied the bands to the paper.  As the former Senior Account Manager explained, the Company sells paper to several "converters," who then print bands on the offline-banded LIP paper. The offline-banded paper is traditional cigarette paper produced by Schweitzer and the LIP bands

_____

[8]     The former Senior Account Manager was employed with the Company in sales for 23 years until August 2003.

are printed on the paper by converters at off-site locations.  As the former Senior Corporate Vice President of Global LIP explained, the Company coats its offline banded paper with its Alginex solution.  The Alginex solution can be applied at Schweitzer's Spotswood and Newberry facilities, and the bands are applied to the paper by a third-party company as it assembles the cigarettes.  The third-party company is also permitted to coat base paper made by other companies with Schweitzer's Alginex solution.  If a cigarette maker purchases base paper from a company other than Schweitzer, the cigarette maker can still obtain the Alginex coating and band printing from Schweitzer through this third-party company.

### E.    The Company's Close Relationship with Philip Morris

45.    The Company's largest and most important customer is Phillip Morris. Indeed, the Company has stated that Philip Morris International Inc., Philip Morris USA, a subsidiary of Altria Group Inc., British American Tobacco, and Japan Tobacco Inc., are its *four* largest customers and together with their respective affiliates and designated converters, accounted for 56%, 49%, and 46% of the Company's 2009, 2008, and 2007 consolidated net sales, respectively.  *See* Schweitzer's Form 10-K for the period ending December 31, 2009, filed on March 8, 2010.  Philip Morris alone comprises 30% of Schweitzer's revenue.  *See* SunTrust Robinson Humphrey analyst report dated February 11, 2010.

- 23 -

46.     According to the former Lab Tester, Schweitzer and PMUSA had a long-term relationship.  According to the former Senior Research Scientist,[9] Schweitzer and Philip Morris had worked together for years under an "evergreen contract," which referred to the "single-source" nature of the contract.   The former Lab Tester explained that the Company made various types of cigarette paper for PMUSA even before it began producing the online banded LIP paper.   While at one point Schweitzer produced some cigarette paper for Philip Morris at one of its facilities in France, in or around 2004, Philip Morris said it only wanted its cigarette paper produced at the Spotswood Mill because it claimed that paper had a better taste.

47.     Philip Morris had a lot of say in the manufacturing process at the Spotswood Mill.  For example, when the former Lab Tester was initially hired as a lab technician at Spotswood, he was hired along with three other lab technicians to specifically work on Philip Morris's banded paper.  It was this former employee's understanding that Philip Morris paid for the lab technicians' salaries, even though they were technically Schweitzer employees.  Moreover, the former Lab Tester stated that it was his understanding that Philip Morris was very concerned about quality and

---

[9]     The former Senior Research Scientist was employed with the Company from 1988 through August 31, 2006.  In this capacity, the former Senior Research Scientist was involved in the development of the LIP technology.

wanted its own dedicated lab technicians to perform additional testing than was the norm at Schweitzer.

48.     The former Senior Research Scientist explained that Philip Morris "knew everything" about Schweitzer's cost structure.  It was common knowledge among Schweitzer employees that Philip Morris purchased Schweitzer's cigarette papers at a lower price than Philip Morris's competitors, and that the cost structure was part of the contract.  This former employee further explained that it was well known around the Company that Philip Morris had "yanked Schweitzer's chain for years," and that the contract was poorly negotiated and was more favorable to Philip Morris than to Schweitzer.

49.     The former Senior Research scientist further explained that Schweitzer was probably amenable to this kind of relationship because Philip Morris bought the Company's cigarette papers at a higher volume than other customers.  Additionally, Schweitzer achieved some level of prestige associated with manufacturing products for Philip Morris and was able to use the relationship as "a negotiating chip" when talking to potential overseas customers.  The close relationship between Schweitzer and PMUSA was confirmed by the former Senior Account Manager.  This former employee explained that Schweitzer had a single-source manufacturing agreement, which allowed Philip Morris to buy Schweitzer products at lower prices than

competitors and allowed Schweitzer to fill Philip Morris's orders before filling the orders of other customers, regardless of when the other orders were received. Moreover, the former Senior Account Manager noted that the single-source agreement was probably more favorable to Philip Morris than to Schweitzer but that it was typical that Philip Morris had a lot of sway over Schweitzer.

50.    According to the Former Lab Tester, in 2009 and possibly earlier, there was talk among Spotswood employees that PMUSA's contract with Schweitzer was coming to an end.  This former employee was not privy to the specifics of the PMUSA contract, but he believed it was a multi-year agreement and had heard talk around the mill that Philip Morris might be switching to a "year-to-year" contract instead of committing to another long-term agreement.  Indeed, in October 2009, the former Lab Tester and other Spotswood Mill employees attended a town hall-type meeting led by Spotswood Mill Manager Chuck Vollmer ("Vollmer").  The meeting was held in a conference room on the second floor of the Spotswood Mill's two-story "front office," and lasted for about an hour.  This meeting was a general business overview meeting in which Vollmer told employees that the Company's overall contract with Philip Morris had expired and that Philip Morris would be researching whether it could buy banded paper from other manufacturers.  The former Lab Tester was under the impression that PMUSA eventually wanted to move away from using

the MOD adaptor and instead wanted to use the offline banded LIP paper because it performed better than the online banded LIP paper.

51.     Thus, Schweitzer and Philip Morris were heavily intertwined in the development of LIP paper.  As a result, the Company's continued relationship with Philip Morris was critical to its ability to maintain its domestic market share and achieve financial growth.

### F.     Defendants Knowingly Misled the Market as to the Strength of Schweitzer's Competitive Position

52.     As detailed above, Schweitzer's growth is heavily dependent on its ability to maintain its competitive position and market share both domestically and internationally.  Moreover, this was a metric that the market followed carefully.  Accordingly, in order to complete a stock offering in November 2009 and keep its stock price buoyed throughout the Class Period, Defendants misled the market to believe that its relationship with Philip Morris was strong and that its technology was protected from foreign competitors.  In reality, Defendants knew but concealed that the Company was facing significant threats to its market share both domestically and internationally.

53.     Indeed, as Philip Morris was the Company's biggest customer and the two companies had a long-term relationship, Defendants were intimately aware of any changes in the Company's supply arrangements with PMUSA.  Yet, Defendants knew

but failed to disclose threats to this significant relationship, including the fact that Philip Morris had decided to use another supplier and it was sampling LIP paper printed by a U.S. converter on imported base paper.   Philip Morris's use of a competitor's products threatened the underpinnings of its relationship with Schweitzer and Schweitzer's market share.   Moreover, Defendants knew but failed to disclose the extent of the Company's dispute with Philip Morris over their cost-plus agreement.

54.   Likewise, throughout the Class Period, Defendants knew but failed to disclose to the market that the Company's competitive position with respect to LIP paper was not adequately protected from foreign competition.   Indeed, Defendants knew that competitors in Europe were developing alternative methods to manufacture banded LIP paper and that efforts by other manufacturers to invade Schweitzer's territory were growing.

55.   Despite this, Defendants continued to misleadingly tout the strength of the Company's intellectual property and competitive position in order to fool the market.   In such a way, Defendants' false statements and omissions artificially inflated Schweitzer's stock price throughout the Class Period, enabling the Company to complete an offering in November 2009 of 1.8 million shares of common stock at an

inflated price of $60 per share for gross proceeds of $108 million.[10]  The offering

enabled the Company to fund the construction and working capital needs of a new

production facility in the Philippines and the Company's equity contribution for a

planned joint venture in China.  *See* Form 424B5 filed on November 12, 2009.

56.     Eventually Schweitzer was no longer able to keep the competitive threats

it was facing under wraps and was forced to take action in order to protect its

intellectual property.  On February 10, 2010, after the market closed, Schweitzer

announced that in light of its assessment of activities in the market, it had filed a

patent infringement action against four competitors: Delfort Group, Astra Tobacco

Corporation, Julius Glatz, and LIPtec, for infringing on U.S. Patent No. 6,725,867.  In

addition, Defendants revealed that the Company's dispute with Philip Morris over its

cost-plus agreement was more significant than originally disclosed – approximately $9

million – which, if resolved unfavorably, would have a material adverse effect on the

---

[10]     On November 9, 2009, Schweitzer announced its plan to offer 1.8 million
shares of the Company's common stock in an underwritten public offering.  Goldman,
Sachs & Co. would be acting as the book-running manager for the offering.  On this
date, Defendants filed with the SEC the shelf registration statement and preliminary
prospectus for the offering on Forms S-3ASR and 424B5, respectively.  Thereafter, on
November 11, 2009, Defendants issued a supplemental prospectus, which was filed
with the SEC on Form 424B5 on November 12, 2009.  The Company also granted the
Underwriters a 30-day option to purchase up to 270,000 additional shares of common
stock on the same terms and conditions as the purchase and sale of the 1,800,000
shares of common stock.

company's results of operations.  Moreover, the next day, on a call with analysts,

Defendants revealed that Schweitzer was facing further threats to its relationship with

Philip Morris, its key customer.  Indeed, it was revealed that Philip Morris had

informed Schweitzer of its intention to use LIP paper printed by a third party.  Even

more startling were Defendants' ***admissions*** that they had known since ***last year*** that

Philip Morris would be using a competitor's product:

- No. I think at this stage, the only new developments last year, which is still am the very small scale is to use a printed band product on one of Phillip Morris USA's low-cost volume, talking about one or two stock-keeping units.  *See* ¶83 below.

- In the discussions we had with Phillip Morris USA last year, it appears to us that the intention to assess an alternative product is essentially driven by security of supply considerations.  *See* ¶81 below.

57.    These announcements, which stood in stark contrast to Defendants'

previous disclosures, stunned the market, causing the price of Schweitzer stock to

plummet by approximately 34% on unusually high trading volume, to close at $46.65

on February 11, 2010, resulting in millions of dollars of investor losses.

58.    At the same time that Defendants misled shareholders, causing them to

suffer millions in losses, Defendant Thompson lined his pockets through insider sales

of Company stock while in possession of material non-public information for

proceeds totaling more than $1.4 million.  *See* ¶¶93-95 below.

## V.    DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

59.    The Class Period begins on August 5, 2009.  On this date, Defendants

issued a press release attached to Form 8-K announcing the Company's second quarter

2009 financial results.  The press release stated in pertinent part:

> ALPHARETTA, GA, August 5, 2009 — Schweitzer-Mauduit International, Inc. (NYSE: SWM) ("Schweitzer-Mauduit" or "the company") today reported second quarter 2009 earnings results for the period ended June 30, 2009.
>
> *        *        *
>
> Second Quarter Operational Highlights:
>
> --        Continued strong growth in high-value products
>
> --        Expanding demand for Low Ignition Propensity (LIP) in North America and beyond
>
> *        *        *
>
> Frederic Villoutreix, Chairman of the Board and Chief Executive Officer, commented, "Our second quarter results further build on our first quarter earnings improvement and are indicative of the successful implementation of our operating and financial strategy. We are benefiting from restructuring initiatives aimed at transforming our core manufacturing operations toward higher-value products. We drove strong results in the second quarter, exceeding our own expectations for operating profit margin gains and free cash flow."
>
> Mr. Villoutreix continued, "Our year-to-date performance gives us confidence in both our plan and in our ability to execute that plan. Our near term strategy will continue to focus on our ongoing transformation that better positions us to effectively manage through these uncertain economic times. ***We are focused on cost control, operational efficiency***

*and the delivery of earnings growth from our high value LIP and reconstituted tobacco products. As a result of our record-level second quarter results, coupled with a less uncertain general economic outlook for the balance of the year, we now expect to achieve full-year earnings better than $3.50 per share, excluding restructuring and impairment expenses but including expected incremental operating losses ranging from $0.42 to $0.47 per share related to the closure of the Malaucene facility.*"

60.    Also, on August 5, 2009, Defendants filed the Company's second quarter

Form 10-Q with the SEC, for the period ending June 30, 2009, which was signed by

Defendant Thompson.  The 2009 second quarter 10-Q reaffirmed the financial results

announced in the press release in ¶59.   Further, the Form 10-Q contained the

following statements:

- Based upon the states that have passed LIP regulations, demand for this product is expected to grow from the current level of approximately 49 percent of North American cigarette consumption to approximately 89 percent by early 2010. Additionally, states representing essentially all of North American consumption have either passed or proposed LIP regulations, and all major cigarette producers have announced voluntary national distribution of this technology, supporting the likelihood that LIP cigarettes will be sold nationwide by late 2009 or early 2010. *As a result, we expect to realize continued growth in demand for cigarette paper used in LIP cigarettes, which would continue to significantly benefit our U.S. business unit's results.*

- International LIP efforts continue, especially in the European Union, or EU. Australia will implement LIP regulations effective in March 2010 and Finland will follow with implementation in April 2010. The compliance test standards for Australia and Finland are consistent with test standards in Canada and the United States. In July 2009, SWM announced that the British

American Tobacco affiliate in Australia, which has an approximate 60 percent share of that market, will exclusively use SWM's Alginex® banded papers.

- In June 2008, the EU's Standardization European Committee, known as CEN, mandated development of an ignition propensity standard. This standard is currently under development by working groups within the International Organization for Standardization, known as ISO, with expectations that the standard will be published by late 2010 or early 2011. Implementation of LIP regulation in the EU is expected by 2012. Additionally, other countries including South Korea, South Africa and Brazil are discussing possible LIP regulation. *These actions indicate that it is increasingly likely LIP cigarette regulations outside of North America will become effective in the next 1 to 3 years thus increasing demand for SWM's banded cigarette paper technology used in these cigarettes.*

- Accordingly, we have begun implementing plans to establish LIP production capability in Europe with a planned commencement of operations during early 2010 and continue to work with our customers to finalize product developments and establish supply terms. We continue to study further LIP production capacity plans to meet the full extent of EU demand for cigarette paper used in LIP cigarettes and expect to select a location for a second production site in Europe. *These legislative and capacity planning developments involving LIP requirements are positive for us given our leadership position in this technology with our Alginex® banded papers and ability to provide one or more commercially proven LIP solutions to cigarette manufacturers.*

- The U.S. segment's operating profit was $12.5 million in the three months ended June 30, 2009, an $8.6 million increase from $3.9 million in the prior-year quarter. Higher selling prices and changes in the mix of products sold increased operating profit by $10.4 million, *primarily due to higher sales of cigarette paper for LIP cigarettes.*

- Several factors driving the improved second quarter results are expected to continue for the remainder of 2009. *We expect to realize further benefit from increased sales of RTL and cigarette paper for LIP cigarettes, especially as the U.S. market implements what is now essentially 100 percent lower ignition propensity regulation by January 2010.* We also expect to initiate production of cigarette paper for LIP cigarettes during late 2009 to service our recently announced agreement to supply the Australian market.

- We remain focused on successfully executing our business strategies to deliver value to our shareholders and customers. The on-going transformation of Schweitzer-Mauduit puts us in a better position to effectively manage through these continuing uncertain economic times. *We will continue our increased attention to cost control, operational efficiency and the delivery of earnings growth from our high value LIP and reconstituted tobacco products. We are committed to maintaining the strength of our balance sheet by aggressively managing cash flows while making the necessary adjustments to maintain our competitiveness in our base paper business.*

61.     Moreover, Defendants Villoutreix and Thompson asserted that the information contained in the second quarter 2009 Form 10-Q was accurate. Specifically, Defendants Villoutreix and Thompson signed Sarbanes-Oxley ("SOX") certifications that stated:

1. I have reviewed this quarterly report on Form 10-Q of Schweitzer Mauduit International, Inc. (the "Registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4. The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual

report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

62.   On the next day, August 6, 2009, the Company hosted an earnings conference call with analysts to discuss the Company's second quarter 2009 financial results.  Defendants Villoutreix and Thompson participated in this conference call.  In his opening remarks, Defendant Villoutreix stated that "[g]rowth of our high value products, that is Low Ignition Propensity papers or LIP and Reconstituted Tobacco Leaf products or RTL remain strong and in line with our expectations at nearly 10% growth over the prior year period."  In the question and answer session that followed, Defendant Villoutreix touted the strength of the Company's LIP patents:

***Ann Gurkin - Davenport - Analyst*** - Okay. And then, last, if I could just get an update really on your confidence in your LIP patents outside of the US at more of -- as more countries look to require the use of LIP, I would think competitive pressures would intensify. And so what is your -- your confidence level in patents on your process?

***Frederic Villoutreix -*** Schweitzer-Mauduit International, Inc. - Chairman, CEO

***I would say our confidence level is good. We have some patents that were already granted in Europe. Some others are in the final stage of application and we have good reason to believe that we have a solid IP protection there.***

63.     In response to a question regarding who the suppliers would be in Europe

for the LIP product, Defendant Villoutreix stated as follows:

***David Sachs - Hockey Capital - Analyst -*** Okay. Terrific. And Australia's BAT selected you in Australia, who else is left to select in Australia and then from Finland to other countries that's coming up and when would you expect the decision to be made in Europe on who the suppliers might be for LIP product?

***Frederic Villoutreix*** - ***Schweitzer-Mauduit International, Inc. - Chairman, CEO -*** So let me answer that question. For Australia, BAT is a market leader in this country with the market coverage estimated at 60%. ***The other big player is Phillip Morris International and I'll say, Phillip Morris International at this stage has not officially announced their technology decision. We had some indication, but they will adopt the online technology which we -- the same as Phillip Morris USA (inaudible-accented language) have.*** And so we anticipate that we could fill part of their needs knowing that there's a competitor in Spain that has also production capabilities. So this is just speculation at this stage. No decision has been made.

*     *     *

In terms of Europe, the European community is making progress in defining the standard for LIP regulation. We continue to believe as our customers that the LIP regulation is likely to become effective in late 2011 -- 2012. And again, when we look at these time line, likely the main customers will firm up their preliminary decision sometime in very late 2009, more likely 2010.

64.     The market reacted positively to Defendants' statements regarding the Company's second quarter 2009 financial results and Defendants' confidence in their patents.  For example, on August 6, 2009, Oppenheimer & Co., Inc. issued an analyst report rating Schweitzer stock as an "outperform" and stating: "LIP penetration in the U.S. has doubled to almost 50% vs. ~25% in 2Q08."

65.     As a result of Defendants' misrepresentations, and resulting analyst affirmation, the Company's stock price rose from $34.21 on August 5, 2009 to close at an artificially inflated price of $47.90 per share on August 10, 2009.

66.     For the reasons stated in the Substantive Allegations above, and as further detailed herein, the statements in ¶¶59-63 above, which touted among other things, Defendants' confidence in Schweitzer's intellectual property, were materially false and misleading when made or omitted to make such statements not false and misleading because: (a) Schweitzer's relationship with PMUSA – its largest customer – was threatened by contractual disputes that could have a material adverse effect on the Company's results of operations; (b) PMUSA had begun to seek out competitors to source its paper needs; (c) Schweitzer's competitive position was not adequately

protected from foreign competition as to LIP paper and such competitors were increasingly developing alternative methods to develop LIP paper; (d) Schweitzer's competitive position was much more precarious than represented by Defendants; (e) efforts by competitors to invade Schweitzer's market share were growing; and (f) for the reasons detailed herein, the SOX certifications signed by Defendants and incorporated in the Company's Forms 10-Q were false.

67.    On November 3, 2009, Defendants issued a press release, which was attached to a Form 8-K filed with the SEC, announcing Schweitzer's financial results for the third quarter 2009, for the period ended September 30, 2009.  The press release stated in pertinent part:

> ALPHARETTA, GA, November 3, 2009 — Schweitzer-Mauduit International, Inc. (NYSE: SWM) today reported third quarter 2009 earnings results for the period ended September 30, 2009 and announced plans to construct an Asian greenfield production site to produce reconstituted tobacco leaf (RTL).
>
> Third Quarter/Year-To-Date Financial Highlights:
>
> • Third quarter net income of $4.5 million; $24.9 million year-to-date
>
> • Third quarter net sales of $184.5 million; $551.9 million year-to-date
>
> *       *       *
>
> Third Quarter Operational Highlights:
>
> • Continued growth in high-value products

• Growing demand for RTL products helped drive gains from this high-value product

• Expanding demand for Low Ignition Propensity (LIP) cigarette papers in North America and beyond

\*        \*        \*

Frédéric Villoutreix, Chairman of the Board and Chief Executive Officer, commented, "Our third quarter results continue to build on the broad-based improvement in our business achieved in the first half of 2009. Our excellent results for the quarter demonstrate the continuing success of our restructuring initiatives to transform our core manufacturing operations toward higher-value products. During the quarter, we progressed in closing our Malaucène, France production site and announced further restructuring activity in France and the U.S. resulting in additional restructuring and impairment expenses. These actions are anticipated to be the last of our downsizing steps for the foreseeable future and were due to continued declines in demand for our traditional tobacco-related papers in North America and western Europe. *We are focused in the near term on successfully executing the remaining restructuring activities, continuing to grow our RTL and LIP business* franchises and sustaining profitable operations at our Chinese paper joint venture, CTM. We are also excited to announce a major growth initiative: the planned approximate $117 million investment to establish a wholly owned greenfield RTL production facility in the Philippines."

Mr. Villoutreix continued, "By expanding RTL through a planned production facility in the Philippines, we expect to significantly strengthen our leadership position in this key product segment while expanding our presence in emerging markets with strong growth prospects. *Also, through our RTL and LIP technologies, we are poised to benefit from increased regulatory efforts to reduce undesirable aspects of cigarettes. The transformation of our RTL franchise into a truly global operation, ongoing efforts to expand our LIP franchise to Europe and beyond and the revitalization of our base paper business*

- 40 -

*establishes a formidable foundation for future revenue and earnings growth.*"

"SWM is becoming a premier specialty company and living up to our vision of being the undisputed leader of engineered solutions to the tobacco industry. We now expect to achieve full-year 2009 earnings of at least $4.00 per share, excluding restructuring and impairment expenses but including expected operating losses of approximately $0.50 per share related to the closure of the Malaucène facility. *For 2010, we estimate earnings per share of approximately $5.00, excluding restructuring and impairment expenses, with growth attributable to expanding RTL and LIP sales, full year profitability at our China paper joint venture and sustained profitability in our base paper business despite expected pressures on current margins caused by lower demand, a likely difficult pricing environment for major customers' 2010 contract renewals and inflationary pressures.*"

Third Quarter 2009 Results

Net sales were $184.5 million in the three month period ended September 30, 2009, a 7% decrease versus the prior-year quarter.

\*       \*       \*

During the third quarter, Schweitzer-Mauduit benefited from favorable pricing impacts versus the comparable prior year period. The approximate 58% rate of LIP regulation in effect in the North American market by the end of the third quarter 2009 caused a 26% increase in sales volume of this high value product, as compared to the prior year quarter.

\*       \*       \*

Schweitzer-Mauduit announced today a quarterly common stock dividend of $0.15 per share. The dividend will be payable on December 28, 2009 to stockholders of record on November 23, 2009.

- 41 -

68.    Also, on November 3, 2009, Defendants filed the Company's third quarter 2009 Form 10-Q with the SEC, for the period ending September 30, 2009, which was signed by Defendant Thompson.   The 2008 third quarter Form 10-Q reaffirmed the financial results announced in the press release in ¶67 above.  Further, the 2009 third quarter Form 10-Q contained the same SOX certifications from Defendants Villoutreix and Thompson that were included in the second quarter 2009 Form 10-Q.  Further, it contained the following false statements:

- Based upon the states that have passed LIP regulations, demand for this product is expected to grow from the current level of approximately 58% of North American cigarette consumption to approximately 100% by early 2010. Additionally, states representing essentially all of North American consumption have either passed or proposed LIP regulations, and major cigarette producers have announced voluntary national distribution of this technology, supporting the likelihood that LIP cigarettes will be sold nationwide by late 2009 or early 2010. *As a result, we expect to realize continued growth in demand for cigarette paper used in LIP cigarettes, which would continue to significantly benefit our U.S. business unit's results through 2010.*

- International LIP efforts continue, especially in the European Union, or EU. Australia will implement LIP regulations effective in March 2010 and Finland will follow with implementation in April 2010. The compliance test standards for Australia and Finland are consistent with test standards in Canada and the United States. In July 2009, SWM announced that the British American Tobacco affiliate in Australia, which has an approximate 60% share of that market, will exclusively use SWM's Alginex® banded papers.

- In June 2008, the EU's Standardization European Committee, known as CEN, mandated development of an ignition propensity standard. This standard is currently under development by working groups within the International Organization for Standardization, known as ISO, with expectations that the standard will be published by late 2010 or early 2011. Implementation of LIP regulation in the EU is expected by 2012. Additionally, other countries including South Korea, South Africa and Brazil are discussing possible LIP regulation. These actions indicate that it is increasingly likely LIP cigarette regulations outside of North America will become effective in the next 1 to 3 years thus likely increasing demand for SWM's banded cigarette paper technology used in these cigarettes.

- Accordingly, we have begun implementing plans to establish a first LIP production facility in Europe with a planned commencement of operations during 2010 and continue to work with our customers to finalize product developments and establish supply terms. *We continue to study further LIP production capacity plans to meet the full extent of EU demand for cigarette paper used in LIP cigarettes and expect to select a location for a second production site in Europe. These legislative and capacity planning developments involving LIP requirements are positive for us given our leadership position in this technology with our Alginex® banded papers and ability to provide one or more commercially proven LIP solutions to cigarette manufacturers.*

- Schweitzer-Mauduit continues to advance the strategy to transform its base paper manufacturing operations to better fit the global tobacco market while growing its high value products, principally reconstituted tobacco and cigarette paper for LIP cigarettes.

- Several factors that drove improved third quarter results are expected to continue for the remainder of 2009. These include continuing growth in sales of RTL and cigarette paper for LIP cigarettes, especially as the U.S. market implements what is now essentially 100% lower ignition propensity regulation by January

2010 as well as initiation of sales to service expected Australian market needs.

- By expanding our RTL capacity with a new production facility in the Philippines, we expect to significantly strengthen our leadership position in this key product segment while expanding our presence in emerging markets with strong growth prospects. *Also, through our RTL and LIP technologies, we are poised to benefit from increased regulatory efforts to reduce undesirable aspects of cigarettes. The transformation of our RTL franchise into a truly global operation, ongoing efforts to expand our LIP franchise to Europe and beyond and the revitalization of our base paper business establishes a formidable foundation for future revenue and earnings growth.* SWM is becoming a premier specialty company and living up to our vision of being the undisputed leader of engineered solutions to the tobacco industry. In 2010, we expect to build upon our substantial growth in earnings being achieved in 2009. This growth is attributable to expanding RTL and LIP sales, full year profitability at our China paper joint venture and sustained profitability in our base paper business despite expected pressures on current margins caused by lower demand, a likely difficult pricing environment for major customers' 2010 contract renewals and inflationary pressures.

- We are presently the sole supplier of banded cigarette papers for use in LIP cigarettes to Philip Morris-USA for its U.S. requirements under a long-term supply agreement. This supply agreement is a cost plus arrangement, and Philip Morris-USA has advised us that it disagrees with the manner in which we have determined one aspect of the cost of this product as invoiced in the second and third quarters of 2009. Philip Morris-USA has exercised its contract right to have an independent party audit our cost calculation. We have provided Philip Morris-USA with the support for our calculation and confirmed that it was done in accordance with methodology consistently applied over the life of the supply agreement and in accordance with its terms. We anticipate that this matter could result in litigation between Philip

- 44 -

Morris-USA and us. ***As of September 30, 2009, the amount disputed was approximately $3 million to $4 million.***

69.     On the next day, November 4, 2009, Defendants held a conference call with analysts to discuss the Company's third quarter 2009 financial results. Defendants Villoutreix and Thompson participated in this conference call.  In his opening remarks, Defendant Villoutreix commented on the growth of the Company's LIP products, stating that "[g]rowth of our high value products, LIP papers and RTL products, was impressive at nearly 24% over the prior year period."

70.     In the question and answer session that followed, Defendant Thompson answered a question regarding the Company's announced dispute with Phillip Morris:

*Ann Gurkin - Davenport & Co. - Analyst -* Okay. Great. And then third, in your Q, you reference a dispute with Philip Morris USA. Any other details you can share on that? Or is there any risk that that contract can change and you will no longer be a sole supplier of LIP to PM USA?

*Peter Thompson - Schweitzer-Mauduit International - CFO -* The nature of the dispute that we disclosed in the Q is over the mechanics of how the current agreement works with Philip Morris USA for pricing of the banded cigarette product. Obviously there's a mechanism that's implied with that dispute because it's not a fixed price contract. And there's a dispute over one step in the calculation of pricing that obviously has fairly significant impact because of the stated $3 million to $4 million value of the dispute. But that's a specific issue related to current invoicing. ***In terms of any change with Philip Morris USA going forward in our supply to them of the banded cigarette paper product, at this point, no, if there were a change in terms of an awareness that we had on a different sourcing or a different product form that was going to materially effect our operations, we would have to say so, or a change in the conditions of the supply agreement that we have, we***

- 45 -

*would have to say so.* That's always a potential. Clearly, especially as the US market declines and there's less and less volume, the Philip Morris USA product is dependent on the New Jersey mill. And as we've just announced, at some point, if volume gets too low, it's very difficult to effectively operate a facility. So, the risk of the product that Philip Morris currently uses for LIP is more tied to the volume issues and the economic viability of that single New Jersey facility than any other issues. *So, no, there's no specific news on changes in sourcing. But certainly that could happen at some point.*

71.    Moreover, when asked about European competition to the Company's

intellectual property, Defendant Villoutreix responded as follows:

*David Sachs - Hocky Capital - Analyst* - If we switch over to LIP in Europe, assuming now the intellectual property that you have will carry over there, is there anyone that has a competitive offering or the European market could look similar to the US market given your IP and possible market share increase from your current 33% or 35% of the base paper business?

*Frederic Villoutreix - Schweitzer-Mauduit International - Chairman, CEO-* I would say, David, that there is a significant amount of competitive activity in the evaluation of products but as of today none that have been validated by the multinationals. *My belief is it has a lot to do with the strength of our IP and patent portfolio.* And so, when we look at Europe, I think what we have signaled in the past is that we foresee the European market to be more competitive than the US markets, elsewhere it's the position, our flagship technology as the preferred choice by the top four multinationals who command 90% market share in the EU and elsewhere to achieve that is to go with a combination of direct selling and licensing agreements.

72.    The market reacted positively to Defendants' statements regarding the

Company's third quarter 2009 financial results.  For example:

(a)     On November 3, 2009, Oppenheimer & Co., Inc. issued an analyst report maintaining its rating for Schweitzer stock as an "outperform" and stating: "The company's high-value RTL and LIP offerings continued to drive its profitability."

(b)     On November 4, 2009, SunTrust Robinson Humphrey issued an analyst report rating Schweitzer as a "buy" and raising its estimates, stating that "[t]he earnings potential from LIP looks as strong as ever."

73.     As a result of Defendants' misrepresentations, and resulting analyst affirmation, the Company's stock price rose from $53.52 on November 3, 2009 to close at an artificially inflated price of $59.91 on November 5, 2009.

74.     For the reasons stated in the Substantive Allegations above, and as further detailed herein, the statements in ¶¶67-71 above, which touted among other things, the strength of the Company's intellectual property and patent portfolio, were materially false and misleading when made or omitted to make such statements not false and misleading because: (a) Schweitzer's relationship with PMUSA – its largest customer – was threatened by contractual disputes that could have a material adverse effect on the company's results of operations; (b) PMUSA had begun to seek out competitors to source its paper needs; (c) Schweitzer's competitive position was not adequately protected from foreign competition as to LIP paper and such competitors were increasingly developing alternative methods to develop LIP paper; (d)

Schweitzer's competitive position was much more precarious than represented by

Defendants; (e) efforts by competitors to invade Schweitzer's market share were

growing; and (f) for the reasons detailed herein, the SOX certifications signed by

Defendants and incorporated in the Company's Forms 10-Q were false.

## VI.   THE TRUTH IS REVEALED

75.   On February 10, 2010, the truth regarding the competitive pressures

Schweitzer was facing was finally revealed, when after the market closed, Defendants

issued a press release attached to a Form 8-K filed by Defendants, which stated in

pertinent part:

> ALPHARETTA, GA, February 10, 2010 — Schweitzer-Mauduit
> International, Inc. (NYSE: SWM) today reported fourth quarter 2009
> earnings results for the period ended December 31, 2009.
>
> *       *       *
>
> Frédéric Villoutreix, Chairman of the Board and Chief Executive
> Officer, commented, "In a challenging economic environment,
> Schweitzer-Mauduit demonstrated the continuing success of our
> restructuring initiatives to transform our core manufacturing operations
> toward higher-value products and significantly strengthened its financial
> and liquidity position. Over the last four years, we have re-engineered
> our company into a position of durable strength. With the closing of our
> Malaucène, France production site and the restructuring activities in
> France and the U.S., announced at the end of the third quarter, we have
> nearly completed the turnaround program begun in 2006. We are now
> shifting our focus to building a great platform to grow our value-added
> products and Asian market share. Our success continues to depend on
> developing industry-leading technologies and products, investing
> globally and delivering results for our customers."

Mr. Villoutreix continued, "Our fourth quarter results were largely in line with our expectations.  We advanced our key strategic initiatives during the quarter, including concluding an agreement with our employees in France on the terms of a general staff reduction, achieving the full conversion to LIP cigarette paper supply for U.S. customers, securing land and commencing construction for our new reconstituted tobacco leaf (RTL) operation in the Philippines, generating a strong level of profitability from our China tobacco papers joint venture and finalizing the last of the shutdown activities for our Malaucène, France facility.  Operationally, we experienced significant paper machine downtime, as expected, in all segments, primarily related to customer demand levels and concluded annual supply agreement negotiations with major customers that were in line with our expectations."

"We have recently made progress on two strategic fronts: advancing plans for an RTL joint venture in China and advancing plans for supplying LIP cigarette paper to the European market.  We anticipate announcing specific projects for both of these areas during the first half of 2010 and continue to expect growth in the demand for LIP in Europe beginning in 2011 and for RTL in China progressively through 2015.  We also continue to closely monitor competitive LIP activity and are vigorously working to protect our market leadership and technology position in both LIP and RTL.  We concluded a secondary offering of SWM common stock during November 2009 that secures the financing needed to advance these strategic opportunities."

***Schweitzer-Mauduit filed a patent infringement action on February 8, 2010, in the United States District Court for the District of South Carolina, Charleston Division.  See the separate press release issued today on this matter.***

\*      \*      \*

In this regard, the company has been advised by Philip Morris – USA that it disputes the manner in which the company has calculated costs for banded cigarette papers under a cost-plus based contract for this product.  ***As of December 31, 2009, the disputed amount is approximately $9 million.  While the company believes that it has properly calculated the***

- 49 -

*amount it invoiced, the ultimate resolution of this dispute, if unfavorable to the company, could have a material adverse effect on the company's results of operations.*

\* \* \*

Oppositions were filed in December 2009 with the European Patent Office (EPO) contesting the grant by the EPO to the company of patent number EP-1482815. The company believes that the EPO properly granted the patent and it intends to respond to the opposition arguments. However, the final resolution of the oppositions could result in the invalidation of the patent or a further limitation of the scope of the patent claims which could affect the competitive value of the patent. The outcome of this dispute would not prevent the company from practicing its Alginex® LIP solution.

76.     Also, on this date, after the market closed, Schweitzer issued a press release entitled "Schweitzer-Mauduit Announces Patent Infringement Action," which stated in part:

Schweitzer-Mauduit International, Inc. (NYSE: SWM) today announced its filing of a patent infringement action on February 8, 2010, in the United States District Court for the District of South Carolina, Charleston Division. The suit was filed against the following parties as defendants:

Delfort Group, an Austrian corporation

Astra Tobacco Corporation, a North Carolina corporation

Julius Glatz, GmbH, a German corporation

LIPtec, GmbH, a German corporation

The suit alleges that the defendants infringe United States Patent Number 6,725,867 based on the sale of cigarette papers in the U.S. that are

- 50 -

designed for use in the manufacture of lower ignition propensity cigarettes. Schweitzer-Mauduit is represented by the firms of Jones Day and Buist, Moore Smythe & McGee P.A.

*The company considers litigation to be a serious matter and does not undertake it lightly or in haste. However, we felt that it was appropriate to take this action now in light of our assessment of activities in the market.* Schweitzer-Mauduit has been engaged in the study of the mechanisms at work and the means for designing cigarette papers that aid in controlling the ignition of a cigarette for over 20 years. To our knowledge, this substantially predates work by any of our competitors in this area and is the foundation on which Schweitzer-Mauduit has built a portfolio of patents around the world that covers a range of products and processes, in particular banding approaches, relating to this technology. In our view, our early work has allowed us to establish a strong intellectual property position on many of the fundamental techniques currently employed commercially to produce lower ignition propensity papers and our work continues to further develop this technology.

77.    On the next day, February 11, 2010, Defendants hosted a conference call with analysts in which they continued to reveal the truth regarding the nature of Schweitzer's relationship with Philip Morris. Indeed, Defendant Villoutreix revealed that:

To the best of our knowledge, combined sales of online vended products to Phillip Morris USA and Schweitzer offline printed papers accounted for 50% of its demand for cigarette paper in 2009. 78% of the demand for LIP compliant papers. Since 2002, we have granted licensed to permit two of our US to have printers to use banded paper, using their own band forming solutions for a portion of their needs.

These accounts for essentially all of the volume LIP US printer section, or 11% of total 2009 demands or about 14% of 2009 demands for LIP-compliant papers. *It is worth mentioning that Phillip USA has informed us of an intention to use LIP product printed by US converter on*

*imported base paper as a commercial alternative for one of their low-cost brands.* To date, we believe that the volume involved is very small. As previously communicated, we regularly retail competitive activity for the presence of other LIP products, and to determine if those products infringe on our granted patents.

*In light of our assessment activities from several European competitors in the market and after completing a number of technical and legal evaluations, we have come to the conclusion that we have at a sound basis for legal action. Hence our decision to file a patent infringement action on Monday against Delfort Group, Julius Glatz, and others. This action is important given the advance of IP regulation in Europe. While it is not possible to predict the outcome of litigation, we would not have initiated this action absent the sound belief that our position is well supported and our commitment is to see it through to its fine conclusion.*

Slide 9 gives a high-level view on our intellectual property, particularly as it relates to LIP patent protection. We have been engaged in the study of the mechanisms at work and the means for designing cigarette papers that aid in controlling the cigarette for over 20 years. To our knowledge, this substantially predates work by any of our competitors in this area, and is a foundation on which Schweitzer-Mauduit has built a portfolio of patents around the world, which cover a range of products and processes related to this technology. In our view, our early work has allowed us to establish a strong intellectual property position on many of the fundamental techniques currently employed commercially to produce lower ignition intensity papers and our work continue in developing this technology, including banding.

At the risk of oversimplifying the evaluation of the patents or patent portfolio, making comparisons between patent portfolios, one needs to consider a number of questions, such as: Are that any blocking patents that would prevent the patent owner from freely participating in patent litigation? To what extent does the patent force a competitor into a less desirable or less efficient method for achieving the same end function? To what extent does the patent scope include functionality? In short the

assessment of patents and patent portfolios is a highly technical, complex, and repetitive inquiry. One remark on Europe.

In early 2009, the European Patent Office, or EPO, used to achieve munition control properties of cigarette papers. Under our European patent practice any party of nine months following the grant of a patent to file a position. **_Three parties filed such a position within the deadline._** We believe that the EPO was correct in granting the patent and will respond to the oppositions. The patent is valid and enforceable, while the opposition proceeding is pending.

Moving to slide 10 and a summary of our key business drivers for 2010. We have now concluded contract negotiations with key customers that resulted in pricing expectations in line with our internal goals. **_Of note, the combination of volume decline in US markets and the captive nature of the banded paper production starts with Phillip Morris USA, we reserve an able to maintain the same margins as in 2009 and other cost agreements._**

While this margin loss was fully included in our guidance for 2010, it will have meaningful effect on the profit margin of our US segments. An effect that we intend to minimize through the timely realignments and our Spotswood operations on banded paper products, and other cost reduction initiatives already at work. More on this in Pete's coverage of our updated guidance from 2010. Now we fully expect to continue to grow our high-value products, LIP papers and products with growth in the high single digits this year.

78.    Defendant Thompson further revealed:

Overall, our earnings guidance has improved $0.20 per share or 5% over our previous 2010 guidance due to continued strong business performance and despite $0.25 per share increase in wood pulp inflationary impacts, and a currently unfavorable euro to dollar exchange relationship. **_Customer negotiations including approximately $6 million to $8 million lower expect profit on LIP sales to Phillip Morris in the US, under our cost-plus agreement are fully included in our updated guidance and are in line with our original estimates._** Global base paper

operations are expected to sustain profitability during 2010, at roughly the same level as during 2009. Non-manufacturing expenses are expected to decline somewhat in 2010, despite expected increases in legal expenses. CTM results are not expected to sustain their fourth quarter pace, but are expected to achieve full-year profitability in 2010, at least 50% above full-year 2009 actual results.

79.    In the question and answer session that followed, Defendant Thompson further elaborated on Schweitzer's pricing agreement with Philip Morris:

> *Ian Zaffino - Oppenheimer & Co - Analyst -* Thank you very much. As far as the pricing environment, when you mentioned the weakness in pricing, can you just go over that as far as, is this more of a competitive thing in is this more, they're in your contract agreements or they're just concessions you make as you go forward. Any type of color there be helpful, thanks. Thanks.

> *Peter Thompson - Schweitzer-Mauduit International - CFO -* Most of the change that we've seen that's been negative has been on the base paper or more commodity type products, and we had three of our major customers have global negotiation processes conclude through the fourth quarter, and we had expected that we would see low single-digit price declines on the base paper, and that's essentially what we saw. *The other significant item, of course, was the change in our pricing agreement with Phillip Morris on the banded project, as we mentioned, a $6 million to $8 million impact, included in our original guidance for 2010 and still included in our guidance for 2010.* On the high-value products, reconstituted tobacco and LIP, there we enjoy a much more stable pricing environment and don't see any issues with price declines. On LIP if there's price declines it would be part of our strategy to pass along cost improvement and lower the price point of the LIP proprietary product. Most of the price increase we saw were through negotiations. The customers benefited from negotiations this last fall, taking place at a time when there's been deflation. There's still softness in volume, especially in parts of the world like western Europe, and so they enjoyed more leverage, but it was in line with our expectations.

80. With respect to Schweitzer's litigation concerning competitive products,

Defendant Villoutreix stated:

> *Ian Zaffino - Oppenheimer & Co - Analyst -* Okay. And then the other question would be the timing of these lawsuits that you're following, what was really, I guess, the straw that broke the camel's back here? Because it seemed like they had some market share. Why wasn't it done earlier? Have they reached a threshold that triggered something -- any information will be helpful.

> *Frederic Villoutreix - Schweitzer-Mauduit International - Chairman, CEO -* Let me take this question, as we've been consistent said, we've been monitoring the market for any sign of activity for the last several years. We have been conducting what I call our homework in terms of the business, the technical, the legal evaluations of some of these products we have seen in the marketplace, and each of these evaluations has its own timing and requirements and information to go forward. As we indicated in our earnings release, and the release about us finding a claim we have completed this process, we have built the database, and also the conviction that it was time to take legal action, which is always the last resort.

> *Ian Zaffino - Oppenheimer & Co - Analyst -* Have you filed any type of cease and desist, or are they still producing or --

> *Frederic Villoutreix - Schweitzer-Mauduit International - Chairman, CEO -* I would say, right now, we have filed a claim, which gives us the option down the road to ask when appropriate, and petition the courts for such relief. In other words, we kept all of the options open.

81. Moreover, Defendant Villoutreix revealed Philip Morris's sourcing to

third parties for printing outside Schweitzer's license:

> *Bill Chappell - SunTrust - Analyst -* Just want to hit on one issue that may or may not be in stock, but your comment on Phillip Morris sourcing to third party for printing outside your license, can you give us

- 55 -

a little more detail on why they're doing that? Is it their ability to take the same licenses and do it for all their business, and how much of a hit if at all is that to your profitability?

***Frederic Villoutreix - Schweitzer-Mauduit International - Chairman, CEO -*** Yes. Let me answer this. It's possible, through the supply agreement that we have in the USA, they have the able to source offline print banded products outside of the contract. So their online banded product, we have an exclusive arrangement with them where 1% of the online products is to be supplied from Spotswood New Jersey. ***In the discussions we had with Phillip Morris USA last year, it appears to us that the intention to assess an alternative product is essentially driven by security of supply considerations.***

Now 100% of the US market has moved to LIP regulation, and and having one product, one mill to support their franchise. The current volume involved is very, very small, and, I would say on our side, you know, the technical evaluation is in progress terms of whether this product may or not infringe with our patents. So we are doing the technical evaluation as well. But as you will understand, since it's in progress, I cannot elaborate further on this matter.

82.    Defendant Thompson also elaborated on the Company's pricing dispute

with Philip Morris:

***Richard Skidmore - Goldman Sachs - Analyst -*** And then just one last question. In your risk section, you have the $9 million of disputed revenue from Phillip Morris USA. Can you talk a little bit about that and how you see that evolving?

***Peter Thompson - Schweitzer-Mauduit International - CFO -*** Sure. Phillip Morris has disputed the calculation under our cost plus agreement for the pricing of the banded product, LIP product, and that dispute has been in place through since about the middle of 2009. It updated -- the amount updated here based on the fourth quarter release based on purely the additional invoicing that we had. We don't know the way that Phillip Morris is determining that disputed amount. They're just saying, "This is

the disputed amount," which reserves their rights to seek relief against that amount. Yet at the same time they're paying their bills, and we're collecting that cash. We believe that we've calculated the pricing correctly under the formula. It's the same formula that that's been in place for many, many years, so we don't believe the dispute has any merit. The fundamental issue is with that the volume declines in the Spotswood facility, the cost-plus for that arrangement is going up, and as Frederic alluded to, when we get to the point where Phillip Morris is the only product being made at that facility, 100% of the cost is essentially going into that product. So I think it's more of a reaction to the situation that we face than any mechanical issues two the calculation of the price.

83.    Defendants also revealed some of the competitive pressures the Company

would be facing:

> ***Ann Gurkin - Davenport & Co - Analyst -*** And can you just review, again, your confidence in -- I think you referenced you have been producing paper and your basis goes back for 20 years or so. Can you review that thought process and the basis for the confidence behind your patents?

> ***Frederic Villoutreix - Schweitzer-Mauduit International - Chairman, CEO -*** Well, again, I think, if you -- you know, we have disclosed some information about our patents, and something -- we have not disclosed a lot more as we'll be taking a risk of weakening our patent right if we share our patents My comments are going to be I would say a high level. They're at a high helpful. But if you look at the IP technologies, where they were 20 years ago and we were involved from day one, if we look at some -- the patents and patent portfolio that we have developed over time, and we continue to level off around LIP, it's very broad, and it's also something that we apply around the world. So we have sales to the US market. And, feel very strongly about -- I think we're in a position of strength. ***Obviously we are seeing some challenges right now, but it's fair to say that all companies will encounter these kinds of challenges.*** We have a great legal team that are advising us, including key partners of Jones Day in New York City and Europe, and I think we are, again, in a position where we have to enforce and exercise our rights.

***Ann Gurkin - Davenport & Co - Analyst -*** And the last question. Back on PM USA it's my understanding you slashed the cigarette paper that you produced out of Spotswood. Is there any risk that they are looking at changing that cigarette paper on their Marlboro brand in the US?

***Frederic Villoutreix - Schweitzer-Mauduit International - Chairman, CEO - No. I think at this stage, the only new developments last year, which is still am the very small scale is to use a printed band product on one of Phillip Morris USA's low-cost volume, talking about one or two stock-keeping units.*** A very small amount. And so at this stage, my answer to your question would be no.

*      *      *

***Jim Rice - GWI Asset Management - Analyst -*** Pete, a little bit confused. I thought you guys had agreements with all of your major manufacturers that you sell to recognizing your IP. So how is Phillip Morris able to go and have a third party produce LIP paper? Are they paying any sort of license fee to you for that?

***Peter Thompson - Schweitzer-Mauduit International - CFO -*** As we disclosed in material today, we have relationships with two customers where there's licenses that are in place for LIP technology, and then there's a portion of the market that's being supplied with imported paper that there's no license in place, and that's where the infringement is occurring that we have the litigation occurring.

What we will do is evaluate any other products that come toward as to whether or not they infringe. Obviously if it's sold through a license, then we've agreed to it whether we participate directly or not. So it really comes down to if a product is being used by any customer or supplied by any competitor that causes a cigarette to go out and meet an LIP standard, we then have to evaluate it and determine whether or not we feel it infringes on our patent and then take action. Now, it could be with a customer who has an existing agreement for us for a product like PMUSA using an alternative product. If they're using a product that's licensed by us -- and there's two cases, then all is fine. If they're using a product that's not licensed by us, we'll evaluate whether or not it's a

problem and take appropriate action. In no case would we have an alternative product being used by a customer that is for an LIP application where at this point we would say it's okay. ***In other words we are evaluating any other LIP products to determine whether or not they infringe.***

***Jim Rice - GWI Asset Management - Analyst -*** So the Phillip Morris purchase, that they've agreed to, is that under license or not?

***Peter Thompson - Schweitzer-Mauduit International - CFO -*** With Phillip Morris, to be clear there's one product supplied under contract, which is an LIP product, the banded online product, we codeveloped with them, and that's the extent of our relationship with PM USA for LIP products. So anything else isn't under that agreement, and that's the only agreement we have with PM USA.

***Jim Rice - GWI Asset Management - Analyst -*** Okay. Do you anticipate also bringing action against Phillip Morris?

***Peter Thompson - Schweitzer-Mauduit International - CFO -*** Well, as we said we're not going to make that decision until we would evaluate the facts of any other alternative products that they're using or being supplied not only to Phillip Morris, but to any customer. So it's fact-dependent. It requires us to do an evaluation of the physical product against our patent and then we make that determination.

\*     \*     \*

***Thomas Russo - Gardner Russo - Analyst -*** Thank you. And then are there legitimate alternative technologies for applying off-line banding that would be permitted with -- going into the market without violating your IP?

***Peter Thompson - Schweitzer-Mauduit International - CFO -*** Well, we couldn't categorically say that. What we would say right now is that of the product in trust that we're not supplying either direct or through licenses or codeveloped with Phillip Morris is where we're filing suit.

*Thomas Russo - Gardner Russo - Analyst -* And over time, as Spotswood increasingly lose the volume and the online product that comes has to absorb the whole burden of the operation, what will happen to the price differences between the offline and online branded products and Phillip Morris will ultimately have to choose the sourcing?

*Peter Thompson - Schweitzer-Mauduit International - CFO -* The online product will continue to rise in cost and, therefore, price as the volume declines.

*Thomas Russo - Gardner Russo - Analyst -* And what would that price spread be for the moment justice by contrast?

*Peter Thompson - Schweitzer-Mauduit International - CFO -* Today it's pretty similar.

84.    The market was stunned by this news, as is evidenced by analyst commentary following this announcement.   For example, SunTrust Robinson Humphrey issued an analyst report on February 11, 2010, which stated in pertinent part:

> Philip Morris USA (PMUSA) currently uses SWM's patented technology for 100% of its online LIP needs. The full conversion of the U.S. market to LIP in 2009 resulted in 100% of PMUSA's paper being sourced from one supplier (SWM) at one plant (Spotswood, NJ). Over the past few months PMUSA chose to source a small part of its LIP needs to a small U.S.-based printer to diversify its supply risk. This revelation led to investor concern that PMUSA, and eventually others, could work around SWM's patents.

85.    As Defendants' announcement and resulting analyst commentary made its way into the market, the market reacted negatively, causing the Company's stock price to plummet by approximately 34% from $70.23 on February 10, 2010 to $46.65

on February 11, 2010, on unusually heavy trading volume, resulting in millions of

dollars in investor losses.   While investors were suffering, as detailed below,

Defendant Thompson profited from Defendants' fraud, by unloading significant

percentages of his Schweitzer common stock holdings at artificially inflated prices

during the Class Period for proceeds of more than $1.4 million.

## VII.   POST-CLASS PERIOD REVELATIONS

86.     On February 12, 2010, the Company issued a press release clarifying its

customer contract with Philip Morris, which stated in pertinent part:

> Schweitzer-Mauduit International, Inc.'s contract with Philip Morris
> USA, Inc. (Philip Morris USA) specifies that Schweitzer-Mauduit will
> serve as the sole supplier of the co-developed, on-line banded cigarette
> paper technology (MOD) used to produce low ignition propensity (LIP)
> cigarettes. Schweitzer-Mauduit is, and has been for many years, a
> strategic partner with Philip Morris USA. Philip Morris USA is able to
> develop or explore alternatives to their MOD technology for their LIP
> needs and has informed us of their intent to do so on a volume of their
> requirements that is not material to SWM's ongoing supply of MOD
> product. The existing agreement does not address either party's rights to
> any technology beyond MOD.
>
> Mr. Villoutreix, commented, "Our comprehensive patent portfolio along
> with a commercially proven product has enabled Schweitzer-Mauduit to
> become the premier provider of LIP technologies for our industry. We
> have, and will continue, to protect our intellectual property and strive to
> further improve our LIP tech-nologies and solutions to sustain this
> leadership position."

87.     Moreover, on August 4, 2010, the Company revealed that the disputed

amount under its cost-plus agreement with Philip Morris was now approximately

$15.8 million:

> The Company has been advised by Philip Morris – USA that it disputes
> the manner in which the Company has calculated costs for banded
> cigarette papers under a cost-plus based contract for this product.
> Currently, the disputed amount is approximately $15.8 million. While
> the Company believes that it has properly calculated the amount it
> invoiced, the ultimate resolution of this dispute, if unfavorable to the
> Company, could have a material adverse effect on the Company's results
> of operations.

*See* Schweitzer's Form 10-Q for the period ending June 30, 2010, filed on August 4,

2010.

## VIII.  ADDITIONAL SCIENTER ALLEGATIONS

88.     The Individual Defendants acted with scienter in that they knew or

recklessly disregarded that the public documents and statements issued or

disseminated in the name of the Company were materially false and misleading; and

knowingly or severely recklessly substantially participated or acquiesced in the

issuance or dissemination of such statements or documents as primary violators of the

federal securities laws.

89.     Indeed, the Individual Defendants, by virtue of their receipt of

information reflecting the true facts regarding Schweitzer and its business practices,

their control over and/or receipt of Schweitzer's allegedly materially misleading

misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Schweitzer, were active and culpable participants in the fraudulent scheme alleged herein. The Individual Defendants knew and/or severely recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public. The ongoing fraud as described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and/or severe recklessness and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

90.    In addition to the numerous allegations throughout the Complaint, herein incorporated by reference, demonstrating the Individual Defendants' scienter, for the reasons further detailed herein, each of the Individual Defendants had knowledge of or recklessly disregarded that the public statements and documents the Company issued or disseminated were materially false and misleading. (*See, e.g.*, Section IV).

91.    Defendants also undertook the affirmative obligation to obtain knowledge in order to ensure that the Company's disclosures to the market were truthful by executing SOX certifications (*see, e.g.*, ¶61).

92.    The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or

disseminated in the name of the Company were materially false and misleading; and knowingly or severely recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

### A.    Defendant Thompson's Suspicious Insider Trading

93.    While in possession of non-public adverse information regarding the threats to Schweitzer's relationship with Philip Morris, its lack of adequate protection from foreign competition as to LIP paper, and the true competitive pressures that Schweitzer was facing, Defendant Thompson took full advantage of the artificial inflation of Schweitzer's common stock caused by Defendants' misrepresentations.  In fact, Defendant Thompson disposed of huge quantities of his stock and reaped massive proceeds.  For instance, between August 10, 2009 and September 10, 2009, Defendant Thompson sold 29,799 shares of common stock for proceeds of more than $1.4 million:

| Date | Shares Sold | Price | Proceeds |
|---|---|---|---|
| 8/10/2009 | 14,144 | $47.88 | $677,215 |
| 8/31/2009 | 6,335 | $50.00 | $316,750 |
| 9/10/2009 | 9,320 | $53.00 | $493,960 |

94.     Defendant Thompson's stock sales were unusual and suspicious in that such sales were executed at times calculated to maximize his personal benefit from the artificial inflation of Schweitzer's stock price.  Defendant Thompson began trading after Defendants falsely assured investors that the Company was confident in its intellectual property.  At this time, Schweitzer's stock traded at prices over $54. Accordingly, Defendant Thompson's stock sales were conspicuously well-timed.

95.     Further, Defendant Thompson's stock sales were unusual and suspicious in amount.  Defendant Thompson liquidated 29,799 shares of common stock for proceeds of more than $1.4 million.  In so doing, Defendant Thompson liquidated more than 54% of his common stock holdings.  Moreover, the proceeds that Defendant Thompson earned from his Class Period stock sales were greater than those he earned from any sales of Schweitzer stock in the five years prior to the Class Period.

## IX.    PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

96.     The market for Schweitzer's publicly traded securities was open, well-developed, and efficient at all times.  As a result of these materially false and misleading statements and failures to disclose, Schweitzer's publicly traded securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Schweitzer's publicly traded

securities relying upon the integrity of the market price of those securities and the market information relating to Schweitzer, and have been damaged thereby.

97.     At all relevant times, the market for Schweitzer's securities was an efficient market for the following reasons, among others:

(a)     Schweitzer's stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Schweitzer regularly made public filings, including its Forms 10-K, Forms 10-Q, and related press releases with the SEC and the NYSE;

(c)     Schweitzer regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Schweitzer was followed by several securities analysts employed by major brokerage firms, such as SunTrust Robinson Humphrey and Oppenheimer & Company, Inc., among others, who wrote research reports that were distributed to the brokerage firms' sales force and the public at large.  Each of these reports was publicly available and entered the public marketplace.

98.     As a result of the foregoing, the markets for Schweitzer's securities promptly digested current information regarding Schweitzer from all publicly available sources and reflected such information in the prices of Schweitzer securities.

99.     Under these circumstances, all purchasers of Schweitzer's securities during the Class Period suffered similar injury through their purchase of Schweitzer's securities at artificially inflated prices and a presumption of reliance applies.

100.    At the times they purchased or otherwise acquired Schweitzer's securities, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.  As a result, the presumption of reliance applies.  Plaintiffs will also rely, in part, upon the presumption of reliance established by a material omission.

101.    In sum, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

        (a)     Defendants made public misrepresentations or failed to disclose facts during the Class Period;

        (b)     The omissions and misrepresentations were material;

        (c)     The Company's securities traded in an efficient market;

        (d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- 67 -

(e)    Plaintiffs and the other members of the Class purchased the Company's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

## X.    LOSS CAUSATION

102.   As detailed throughout and further herein, Defendants' fraudulent scheme artificially inflated Schweitzer's stock price by failing to disclose that: (a) Schweitzer's relationship with PMUSA – its largest customer – was threatened by a contractual dispute that could have a material adverse impact on the Company's results from operations; (b) PMUSA had begun to seek out competitors to source its paper needs; (c) Schweitzer's competitive position was not adequately protected from foreign competition as to LIP paper and such competitors were increasingly developing alternative methods to develop LIP paper; (d) Schweitzer's competitive position was much more precarious than represented by Defendants; and (e) efforts by competitors to invade Schweitzer's market share were growing.

103.   These false and misleading statements, individually and collectively, concealed Schweitzer's true financial circumstances and future business prospects, resulting in the stock being artificially inflated until, as indicated herein, the relevant truth about Schweitzer was revealed.  While each of these misrepresentations was

independently fraudulent, they were all motivated by Defendants' desire to artificially inflate Schweitzer's stock price and the image of its future business prospects to give the market the false notion that the Company's intellectual property was strong, the Company would continue to experience growth as demand for LIP products increased, and it was not facing threats to its market share. Defendants' false and misleading statements had the intended effect and causes, or were a substantial contributing cause of Schweitzer's stock trading at artificially inflated levels, reaching as high as $83.63, throughout the Class Period.

104. These false and misleading statements and omissions, among others, had the intended effect of preventing the market from learning the full truth and keeping the Company's stock price artificially inflated throughout the Class Period. The true picture of Schweitzer's business, operations, and finances was finally disclosed to the market on February 10 and 11, 2010.

105. On February 10, 2010, after the market closed, Schweitzer announced that in light of its assessment of activities in the market, it had filed a patent infringement action against four competitors, and that the Company's dispute with Philip Morris over its cost-plus agreement was more significant than originally disclosed – approximately $9 million – which, if resolved unfavorably, would have a material adverse effect on the company's results of operations. The next day, on

February 11, 2010, Defendants disclosed that that Philip Morris – the Company's largest customer – had informed Schweitzer of its intention to use LIP paper printed by a third party.  These disclosures revealed to the market that Schweitzer was facing threats to its relationship with Philip Morris, Schweitzer's competitive position was not adequately protected from foreign competition as to LIP paper, and Schweitzer's competitive position was much more precarious than represented by Defendants.

106.   When Schweitzer provided the market with these revelations, it was an indication to the market that Defendants' prior Class Period statements were false and misleading.  As a result of the information revealed to the market on February 10 and 11, 2010, the market cast doubt on the veracity of Defendants' prior statements, causing Schweitzer's stock to drop approximately 34%, as it fell $23.58 per share to close at $46.65 on February 11, 2010 on abnormally high trading volume.  The market's negative reaction to Schweitzer's February 10th and 11th revelations is demonstrated in the stock chart below:



107.   The rapid decline in Schweitzer's stock price following the Company's February 10th and 11th disclosures was a direct and foreseeable consequence of the revelation of the falsity of Defendants' Class Period misrepresentations and omissions to the market.  Thus, the revelation of truth at the close of the Class Period, as well as the resulting clear market reaction, support a reasonable inference that the market understood that Schweitzer's prior statements were false and misleading.  In sum, as the truth about Defendants' prior misrepresentations and concealments was revealed, the Company's stock price quickly sank, the artificial inflation came out of the stock, and Plaintiffs were damaged, suffering true economic losses.

108.   The decline in Schweitzer's stock price by approximately 34% from $70.23 on February 10, 2010 to $46.65 on February 11, 2010, was the direct result of the nature and extent of the revelations made to investors and the market regarding the Company's competitive position, market share, and the true nature of its relationship

with Philip Morris that had been concealed or misrepresented by Defendants' scheme and misstatements.

109.   The timing and magnitude of Schweitzer's stock price decline negates any inference that the losses suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  This point is evidenced by the chart below that demonstrates the clear divergence of Schweitzer's stock price from its peer index[11] as the revelation of the truth became known to the market:

---

[11]     As detailed in Schweitzer's Form 10-K for the year ended December 31, 2009, the Company's peer index includes: Neenah Paper, Inc., P.H. Glatfelter Co., Wausau-Mosinee Paper Corp., and Buckeye Technologies, Inc.



110.   The economic loss, *i.e.*, damages, suffered by Plaintiffs was a direct and proximate result of Defendants' scheme and misrepresentations and omissions which artificially inflated Schweitzer's stock price and the subsequent significant decline in the value of Schweitzer's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the market place.

## XI.   NO SAFE HARBOR

111.  The federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there

were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Schweitzer who knew that those statements were false when made.  Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XII.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

112.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired the publicly traded common stock of Schweitzer between August 5, 2009 and February 10, 2010, inclusive (the "Class Period"), and

who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

113.   Because Schweitzer has millions of shares of stock outstanding and because the Company's shares were actively traded on the NYSE, members of the Class are so numerous that joinder of all members is impracticable.  According to Schweitzer's SEC filings, as of shortly before the close of the Class Period, Schweitzer had approximately 15,666,207 shares outstanding. *See* Form 10-Q for the period ending September 30, 2009, filed on November 3, 2009.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiffs believe that Class members number at least in the thousands and that they are geographically dispersed.

114.   Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

115.   Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel experienced and competent in class actions and

securities litigation.  Plaintiffs have no interests that are contrary to, or in conflict with, the members of the Class they seek to represent.

116.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

117.   Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)   whether Defendants violated the federal securities laws as alleged herein;

(b)   whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)   whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

(d)     whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e)     whether Defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts;

(f)     whether the market prices of Schweitzer's securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)     whether the members of the Class have sustained damages as a result of the decline in value of Schweitzer's stock when the truth was revealed and the artificial inflation came out and, if so, what is the appropriate measure of damages.

## COUNT I
## FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

118.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

119.    During the Class Period, Schweitzer and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, Plaintiffs, and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Schweitzer's publicly traded securities; and (iii) cause Plaintiffs and other

members of the Class to purchase Schweitzer's publicly traded securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Schweitzer and the Individual Defendants, and each of them, took the actions set forth herein.

120.   These Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Schweitzer's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued as controlling persons of Schweitzer, as alleged below.

121.   In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*)

and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, product marketing and promotion, financial condition, and operational performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.

122.   Schweitzer and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, sales performance, product marketing and promotion, operations, and future prospects of Schweitzer as specified herein.

123.   These Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Schweitzer's value and performance and continued substantial sales, financial and operational growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Schweitzer and its business operations and future prospects in light of the circumstances under which they were

made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Schweitzer's securities during the Class Period.

124.   The Individual Defendants' primary liability and controlling person liability arise from the following facts:  a) the Individual Defendants were high-level executives at the Company during the Class Period; b) the Individual Defendants, by virtue of their responsibilities and activities as senior executive officers, were privy to, and participated in the creation, development, and reporting of, the Company's internal sales and marketing plans, projections, and/or reports; c) the Individual Defendants enjoyed significant personal contact and familiarity with, was advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and d) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

125.   Each of the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severely reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to each of them.   Such Defendants' material

misrepresentations and/or omissions were done knowingly or with deliberate recklessness and for the purpose and effect of concealing Schweitzer's operating condition, sales, product marketing and promotional practices, and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the Individual Defendants' overstatements, misstatements and omissions of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

126.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Schweitzer's securities were artificially inflated during the Class Period.  In ignorance of the fact that market prices of Schweitzer's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or disregarded with deliberate recklessness by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other

members of the Class acquired Schweitzer's securities during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price decline on or about February 11, 2010, when the artificial inflation was released from Schweitzer stock.

127.   At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known of the true performance, sales, marketing, promotion and other fraudulent business practices, future prospects and intrinsic value of Schweitzer, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Schweitzer publicly traded securities during the Class Period; or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

128.   By virtue of the foregoing, Schweitzer and the Individual Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

129.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class

Period, as evidenced by, among others, the stock price decline on or about February

11, 2010, when the artificial inflation was released from Schweitzer stock.

## COUNT II
## FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

130.   Plaintiffs repeat and reallege the allegations set forth above as though

fully set forth herein.  This claim is asserted against the Individual Defendants.

131.   The Individual Defendants acted as controlling persons of Schweitzer

within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue

of their high-level positions with the Company, participation in and/or awareness of

the Company's operations and/or intimate knowledge of the Company's fraudulent

marketing practices and actual performance, the Individual Defendants had the power

to influence and control and did influence and control, directly or indirectly, the

decision making of the Company, including the content and dissemination of the

various statements which Plaintiffs contend are false and misleading.  The Individual

Defendants were provided with, or had unlimited access to, copies of the Company's

reports, press releases, public filings, and other statements alleged by Plaintiffs to be

misleading prior to and/or shortly after these statements were issued and had the

ability to prevent the issuance of the statements or cause the statements to be

corrected.

132.   In addition, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

133.   As set forth above, Schweitzer and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period, as evidenced by, among others, the stock price decline on or about February 11, 2010, when the artificial inflation was released from Schweitzer stock.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for relief and judgment, as follows:

(a)   Declaring that this action is a proper class action and certifying Plaintiffs as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel for the proposed Class;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)     Such other and further relief as the Court deems appropriate.

## XIV.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  October 11, 2010              ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                      JOHN C. HERMAN
                                      Georgia Bar No. 348370


                                              s/ John C. Herman
                                      _____
                                           John C. Herman

                                      3424 Peachtree Road, N.E., Suite 1650
                                      Atlanta, GA  30326
                                      Telephone:  404/504-6500
                                      404/504-6501 (fax)
                                      jherman@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
JACK REISE (*pro hac vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com

Lead Counsel for Plaintiff

SULLIVAN, WARD, ASHER &
   PATTON, P.C.
CYNTHIA J. BILLINGS (*pro hac vice*)
25800 Northwestern Highway
1000 Maccabees Center
Southfield, MI  48075-1000
Telephone:  248/746-0700
248/746-2760 (fax)
cbillings@swappc.com

Additional Counsel for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 11, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

s/ John C. Herman
JOHN C. HERMAN